UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
and THE STATE OF FLORIDA ex rel.
AMY SANCHEZ,

      Plaintiffs,

v.                                       Case No. 3:14-cv-1453-J-34JBT

SMART PHARMACY, INC., GREGORY
H. BALOTIN, WILLIAM C. SCROGINS,
and CONNIE MOHRMAN,

      Defendants.

_____

UNITED STATES OF AMERICA ex rel.
ASHOK KOHLI,

      Plaintiffs,

v.                                         Case No. 3:16-cv-387-J-34JBT

SMART PHARMACY, INC., and
GREGORY H. BALOTIN,

      Defendants.

_____

## THE UNITED STATES OF AMERICA'S
## COMPLAINT IN INTERVENTION

The United States of America, on behalf of the United States Department of

Health and Human Services and the United States Department of Defense, brings this

action against Defendants Smart Pharmacy, Inc.; SP2, LLC; and Gregory H. Balotin.

## I.   **INTRODUCTION**

1.      This is a civil action brought by the United States against Defendants to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages under the common law theories of payment by mistake and unjust enrichment.

2.      Defendants violated the FCA by presenting, or causing to be presented, false or fraudulent claims for compounded drugs to Medicare and to TRICARE, the federal health care program for active duty military personnel, retirees, and their families. As part of the scheme, Defendants developed compounded topical pain creams containing aripiprazole—an atypical antipsychotic drug—because inclusion of that drug maximized the reimbursement they received from federal health care programs.

3.       Defendants developed the aripiprazole topical formulas knowing that use of the drug to treat pain was not supported by clinical evidence, the drug lacked clinical support for use to treat pain topically, and use of the drug in compounded pain creams was not a medically accepted indication that was covered by Medicare or TRICARE.

4.      Defendants ensured the most expensive and highest reimbursing aripiprazole formulas were used by changing prescriptions without the providers' authorization or obtaining consent for a change under the guise that the originally prescribed formula was not covered by a patient's insurance.

5.      Prescribers who purportedly authorized the aripiprazole pain cream prescriptions frequently were unaware of a medical rationale for using aripiprazole topically for treatment of pain and would not have authorized the prescription had they

known the drug was included in the pain cream.  Moreover, Defendants did not notify prescribers that they were dispensing aripiprazole formulas primarily to maximize their reimbursement rather than because of the safety and efficacy profile of the drug. Defendants received tens of millions of dollars from Medicare Part D and TRICARE for the aripiprazole formulas.

6.      The purpose of compounding is to provide patients with a custom-made drug designed to their individual medical needs.  Defendants' practices turned this idea on its head, customizing the compounded drugs based on how much money the pharmacy was reimbursed rather than a patient's medical needs, and subverting the prescriber's role in the prescription selection process.

7.      In addition, Defendants routinely waived, reduced, or failed to collect complete patient copayment amounts in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), resulting in millions of dollars of loss to federal health care programs.

8.      The United States may recover in a civil FCA lawsuit the amounts paid on claims to federal health care programs that are knowingly false.

## II.   PARTIES

9.      The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and its component the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program.  The United States also brings this action on behalf of the Department of Defense ("DOD") and its

component the Defense Health Agency ("DHA"), which administers the TRICARE program.

10.     Defendants Smart Pharmacy, Inc., and SP2, LLC, are pharmacies organized under the laws of the State of Florida.  The pharmacies are respectively located at 14003-1 Beach Boulevard, Jacksonville, FL 32250, and St. Johns Bluff Road South, Suite 19, Jacksonville, FL 32224.  Smart Pharmacy, Inc., and SP2, LLC, are co-owned by pharmacists Gregory Balotin and William Scrogins.  SP2, LLC, currently operates under the d/b/a "Smart Worker's Pharmacy."  Smart Pharmacy, Inc., and SP2, LLC, are collectively referred to as "Smart Pharmacy" below.

11.     Defendant Gregory Balotin is a pharmacist and a co-owner of Smart Pharmacy, Inc., and SP2, LLC.  In addition, Balotin is the Chief Financial Officer of Smart Pharmacy, Inc., and a managing member of SP2, LLC.  Balotin is a resident of St. Johns County, Florida.

12.     Relator Amy Sanchez filed the first of these consolidated actions, *United States ex rel. Sanchez v. Smart Pharmacy, Inc., et al.*, No. 3:14-cv-1453-J-34JBT (M.D. Fla.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).  At the time, she was a resident of Duval County, Florida, and she is a former employee of Smart Pharmacy, Inc.

13.     Relator Ashok Kohli filed the second of these consolidated actions, *United States ex rel. Kohli v. Smart Pharmacy, Inc. et al.*, 3:16-cv-387-J-34JBT (M.D. Fla.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).  At the

time, he was a resident of Duval County, Florida, and he is a former employee of Smart Pharmacy, Inc.

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 because this action is brought by the United States as a Plaintiff pursuant to the False Claims Act.

15.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants reside or transact business in the Middle District of Florida.

16.    Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants reside or transact business in this District.

### IV.    LEGAL BACKGROUND

#### A.    The False Claims Act

17.    The FCA establishes liability to the United States for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).

18.    Individuals or entities who violate the FCA are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000,

as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.  *Id.* § 3729(a)(1).

19.     For purposes of the FCA, "knowingly" is defined to include actual knowledge, reckless disregard, or deliberate indifference.  *Id.* § 3729(b)(1).  No proof of specific intent to defraud is required.  *Id.*

20.     For purposes of the FCA, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  *Id.* § 3729(b)(4).

21.     For purposes of the FCA, "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]"  *Id.* § 3729(b)(2).

22.     The standard of proof under the False Claims Act is preponderance of the evidence.  *Id.* § 3731(d).

**B.     Anti-Kickback Statute**

23.     The AKS arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on

federal health care programs, and divert federal funds towards goods and services that

are medically unnecessary, of poor quality, or even harmful to a vulnerable patient

population.  To protect the federal health care programs from these harms, Congress

enacted a prohibition against the payment of kickbacks in any form.

24.     The AKS makes it illegal for an individual or entity to knowingly and
willfully:

> [O]ffer[] or pay[] any remuneration (including any kickback,
> bribe, or rebate) directly or indirectly, overtly or covertly, in
> cash or in kind to any person to induce such person—
>
> (A) to refer an individual to a person for the furnishing or
> arranging for the furnishing of any item or service for which
> payment may be made in whole or in part under a Federal
> health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend
> purchasing, leasing, or ordering any good, facility, service,
> or item for which payment may be made in whole or in part
> under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2).

25.     A claim for reimbursement from a federal health care program for items or

services resulting from a violation of the AKS "constitutes a false or fraudulent claim"

under the FCA.  42 U.S.C. § 1320a-7b(g).  Under this provision, claims submitted to

federal health care programs that result from violations of the AKS are *per se* false or

fraudulent within the meaning of 31 U.S.C. § 3729(a)(1)(A)–(B).  Accordingly, a person

violates the FCA when he or she knowingly submits or causes to be submitted claims to

federal health care programs that result from violations of the AKS.

26.     Specific intent is not required to establish a violation of the AKS.  *See* 42

U.S.C. § 1320a-7b(h) ("With respect to violations of this section, a person need not have

actual knowledge of this section or specific intent to commit a violation of this

section.").

27.     Violation of the AKS can subject the perpetrator to exclusion from

participation in federal health care programs and civil monetary penalties.  42 U.S.C. §

1320a-7(b)(7), 42 U.S.C. § 1320a-7a(a)(7).

## V.     THE MEDICARE PROGRAM

### A.     Background on the Medicare Part D Program

28.     Congress established Medicare in 1965 to provide health insurance

coverage for people aged sixty-five or older and for people with certain disabilities or

afflictions.  *See* 42 U.S.C. §§ 426, 426a.

29.     Medicare is funded by the federal government and administered by CMS,

which is part of HHS.

30.     In 2003, Congress passed the Medicare Prescription Drug, Improvement,

and Modernization Act ("MMA"), Pub. L. 108-173, 117 Stat. 2066, which established a

voluntary prescription drug benefit program for Medicare enrollees known as Medicare

Part D.  An individual is eligible to enroll in Medicare Part D if the individual lives in

the service area of a Part D plan and is entitled to Medicare benefits under Medicare

Part A or enrolled under Medicare Part B.  42 U.S.C. § 1395w-l01(a)(3)(A); 42 C.F.R. §

423.30(a).

31.     Medicare Part D coverage is based on a private market model.  Under

Medicare Part D, Medicare contracts with private entities, known as Part D Plan

"Sponsors," to administer prescription drug plans.  A Part D Plan Sponsor may be either

a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly (PACE) organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

32.     Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor.  The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts.  Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

33.     Medicare Part D covers only drugs that are prescribed for a "medically accepted indication," which, in general, means a use that is (1) approved by the U.S. Food & Drug Administration ("FDA") under the Food Drug and Cosmetic Act, or (2) supported by one or more citations in one of the following compendia: American Hospital Formulary Service Drug Information, United States Pharmacopeia-Drug Information (or its successor), or DRUGDEX Information System (collectively, the "compendia").  *See* 42 U.S.C. §§ 1395w-102(e)(1), (e)(4), 1396r-8(g)(1)(B), (k)(6); 42 C.F.R. § 423.100.

34.     With respect to compounded drugs, only the ingredients of the compound that are dispensed for a "medically accepted indication" are eligible for reimbursement under Medicare Part D.  *See* Medicare Program; Medicare Prescription Drug Benefit; Final Rule, 70 Fed. Reg. 4,194 at 4,231–32 (Jan. 28, 2005).

#### B.   Reimbursement Claims under Medicare Part D

35.     When a pharmacy dispenses drugs to a Part D beneficiary, the pharmacy submits a claim electronically to the beneficiary's Part D Sponsor.  The pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the portion of the covered drug cost not paid by the Part D beneficiary at the point of sale.  Sometimes a pharmacy benefit manager, or "PBM," serves as an intermediary between the Part D Sponsor and the pharmacy.

36.     In general, the Part D Sponsor reimburses the pharmacy for compounded drugs based on a negotiated price for each covered ingredient based on common drug pricing benchmarks, including the average wholesale price, wholesale acquisition cost, or maximum allowable cost.  The reimbursement amount also is based in part on the quantity of each covered ingredient in the compounded drug.

37.     The Part D Sponsor is required to submit to CMS an electronic notification of the drug dispensing event, called the Prescription Drug Event ("PDE"), which contains data regarding the Medicare prescription drug claim, including the drug dispensed, the quantity dispensed, whether the drug is a compound, the service provider that dispensed the drug, the prescriber, the patient, the amount paid to the pharmacy, the copayment amount, and whether the drug is covered under Medicare Part D.

38.     Certain information in the PDE is derived from the representations that the pharmacy makes when it submits the reimbursement claim to a Medicare Part D Sponsor.  These representations include the drug dispensed, the quantity dispensed,

10

whether the drug was a compound, the service provider that dispensed the drug, the prescriber, and the patient.

39.     Although the PDE record contains a field that indicates if a drug is a compound, the PDE record does not contain a route of administration field that indicates whether the compounded drug is intended for oral or topical use.  Likewise, the PDE record does not contain a diagnosis code.

40.     If the drug is a compounded drug containing multiple ingredients, the most expensive Part D ingredient in the compound is reported in the PDE record.  In addition, the total quantity of all the ingredients in a compound is reported in the PDE record.  Although the pharmacy submits the quantity of each individual ingredient to the Part D Sponsor to be used to determine the amount of Medicare reimbursement the Part D Sponsor pays to the pharmacy, the quantity of each individual ingredient in a compounded drug is not reported to CMS in the PDE record.

41.     Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

42.     Generating and submitting PDE claims data is necessary for CMS to administer the Part D program and make payments to Part D Plan Sponsors to reimburse them for qualified prescription drug coverage that they provide to Medicare beneficiaries.  Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors.  *See* 42 C.F.R. § 423.322.

43.      CMS pays for Medicare beneficiaries' drugs through several payment mechanisms.  First, Medicare pays a direct subsidy (a capitated payment) to the Part D Plan Sponsor in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in 42 C.F.R § 423.329(b), minus a monthly beneficiary premium as determined in 42 C.F.R. § 423.315(b).  In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the plan.

44.      Second, CMS makes payments to the Part D Plan Sponsor for premium and cost-sharing subsidies on behalf of certain subsidy-eligible individuals as provided in 42 C.F.R. § 423.780 and 423.782.  Cost-sharing subsidies for qualifying low-income individuals are called the Low-Income Subsidy ("LIS") and are documented and reconciled using PDE data submitted to CMS.

45.      Third, CMS pays a reinsurance subsidy to the Part D Plan Sponsor which is equal to 80 percent of covered drug spending above an enrollee's catastrophic threshold.  By way of example, in 2015, a Medicare beneficiary reached the catastrophic threshold after approximately $7,000 in total drug spending and, once that threshold was reached, CMS paid for 80 percent of the beneficiary's additional drug costs.   CMS uses the PDEs submitted by Part D plan Sponsors to ensure that Medicare is subsidizing 80 percent of the Part D beneficiaries' catastrophic coverage costs.

46.      Fourth, the Medicare Part D program includes risk-sharing corridors, which seek to limit a plan's overall losses across all enrollees in the event that a plan's spending for benefits is higher than anticipated at the time that the plan submits its bid.

12

After a reconciliation process conducted at the end of the year, CMS may have to pay additional amounts to a plan if the plan's losses exceed a certain threshold, or CMS may be entitled to recoup excess profits from a plan whose costs fell short of projections that formed the basis for the direct subsidy payment.   This reconciliation process is based on information contained in the PDEs.

47.     The payments made by CMS to the Part D Sponsor come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. § 423.315(a).

**C.     Copayments under Medicare Part D**

48.     A Part D beneficiary may be required to make a partial payment for the cost of these prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "copays").  The patient copay obligations in Medicare Part D exist to encourage efficient use of federally reimbursed health care products by health care providers and consumers.

49.     Standard Medicare Part D benefits require copays that vary throughout the year depending upon a beneficiary's total Part D covered expenses incurred that year up to that point. *See* 42 U.S.C. § 1395w-102.

50.     In the first coverage phase, known as the deductible phase, patients are responsible for 100 percent of drug costs until meeting an annual deductible amount (*e.g.*, $250 in 2006).  *Id*. § 1395w-102(b)(1).

51.     In the second coverage phase, patients pay a 25 percent copay until reaching an "initial coverage limit" (*e.g.*, $2,250 in 2006).  *Id*. § 1395w-102(b)(2).

52.     In the third coverage phase, known as the "coverage gap" or "donut hole," patient copay obligations are higher until the patient reaches an "annual out-of-pocket threshold" (*e.g.*, $3,600 in 2006).   *See* 42 U.S.C. § 1395w-102(b)(2)(D).  For brand name drugs, for example, a patient in the coverage gap owed 100 percent of the cost of the drug through 2010, 50 percent in 2011 and 2012, and 47.5 percent in 2013 and 2014.

53.     In the fourth and final phase of coverage, known as "catastrophic coverage," beneficiaries who do not qualify for LIS pay a copay equaling the greater of 5 percent of the prescription drug cost or a small fixed dollar amount (originally $5 for brand name drugs in 2006).  42 U.S.C. § 1395w-102(b)(4).  As described above, the federal government reimburses 80 percent of all prescription drug costs in this "catastrophic coverage" period through a "reinsurance subsidy" provided to the Part D plans; the Part D plans reimburse the remaining 15 percent.

54.     The financial thresholds for the "deductible," "initial coverage limit," and annual "out-of-pocket threshold" have been updated each year since 2006 pursuant to a statutory and regulatory formula.

**D.     Attestations Regarding Compliance with the AKS and the FCA, and the Submission of Truthful, Complete, and Accurate Claims to Medicare**

55.     In order to receive Part D funds from CMS, the Part D Plan Sponsors—as well as their authorized agents, employees, and contractors (including pharmacies)—are required to comply with applicable federal laws, regulations, and CMS instructions.  By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision

whereby the Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.  Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the FCA and AKS. *See* 42 C.F.R. § 423.505(h)(1).

56.     Accordingly, all contracts entered into between CMS and Plan D Plan Sponsors from 2006 through the present include a provision in which the Sponsor "agrees to comply with . . . federal laws and regulations designed to prevent . . . fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §§ 3729, et seq.), and the anti-kickback statute (§ 1127B(b)) of the Act)." *Id.*

57.     Further, CMS regulations also expressly require that all subcontracts between Part D Plan Sponsors and "downstream" or "related" entities require such entities to perform "any services or other activity" in a manner that "compl[ies] with the Part D Sponsor's contractual obligations," including the Part D Plan Sponsor's contractual obligation to comply with the AKS and False Claims Act.  *See* 42 C.F.R. § 423.505(i)(4)(iv).  Moreover, these entities must also operate under contractual obligations to comply with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(4)(iv).

58.     CMS regulations further require Part D Plan Sponsors to certify to the accuracy, completeness, and truthfulness of the PDE claims data submitted to CMS.

Specifically, the relevant regulatory provision, entitled "Certification of data that determine payment," obligates each Part D Plan Sponsor to certify that "the information CMS relies on in determining payment is accurate, complete and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k). Compliance with the regulatory requirement that the PDE data submitted to CMS is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

59.     Since the Part D program began, CMS has required each Part D Plan Sponsor to sign annually an Attestation of Data Relating to CMS Payment to a Medicare Part D Sponsor, which includes a representation that the PDE claims data the Sponsor submits to CMS is "accurate, complete, and truthful"; the Sponsor has required each subcontractor generating PDE data "to certify that this information is accurate, complete, and truthful based on its best knowledge, information, and belief"; and the Sponsor acknowledges the claims data submitted to CMS "will be used for the purposes of obtaining federal reimbursement and that misrepresentations or omissions in information provided to CMS may result in Federal civil action and/or criminal prosecution."   All approved Part D Plan Sponsors who received payment under Medicare Part D in benefit years from 2006 through the present submitted these required attestations in the same or similar format.

60.     With regard to pharmacies and other subcontractors participating in the Medicare Part D program, CMS regulations further provide: "If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan Sponsor, the

entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."  42 C.F.R. § 423.505(k)(3).

61.    For example, Humana Insurance Company is a Part D Plan Sponsor under contract with CMS to provide prescription drug benefits to Medicare beneficiaries. In its contract with CMS, Humana agreed to provide certifications in accordance with 42 C.F.R. § 423.505(k) and to ensure that any subcontracts or agreements with "downstream" or "related" entities comply with 42 C.F.R. § 423.505(i).

62.    On August 28, 2009, Defendant Balotin, on behalf of Smart Pharmacy, executed a Provider Agreement with Humana to provide pharmacy services to Medicare beneficiaries who are members of Humana's Part D plans.  As required by CMS regulations, Smart Pharmacy's Provider Agreement with Humana obligated Smart Pharmacy to:

    a.  "comply . . . with all federal, state, local and CMS instructions, statutes, ordinances, orders, rules and regulations that are applicable to the provision of Pharmacy Services under the terms and conditions of t[he] Agreement."

    b.  "comply with all applicable Medicare Prescription Drug Benefit Program laws, rules and regulations to which Humana is subject," which includes the obligation to ensure that claims data submitted for reimbursement from Part D is accurate, complete, and truthful.

    c.  "ensure that all persons employed by or contracted with [Smart Pharmacy] who are responsible for the administration or delivery of Medicare Part D benefits or services . . . have completed effective training to detect, correct and prevent fraud, waste and abuse . . . [to] include . . . review of significant federal fraud, waste and abuse laws, including, but not limited to, the False Claims Act and Anti-Kickback Statute."

       d.  "not waive, rebate, or discount the Member Copayment . . . except where
expressly allowed under federal and/or state law and CMS instructions."

## VI.  **THE TRICARE PROGRAM**

63.    TRICARE (formerly known as CHAMPUS) is a federal health care program, as defined in the AKS, 42 U.S.C. § 1320a-7b(f), that is administered by DHA, a component of the DOD.  TRICARE provides health care coverage for active duty military personnel, military retirees, and military dependents.

64.    TRICARE contracts with Express Scripts, Incorporated ("ESI") to administer the prescription drug coverage of the TRICARE program, including the processing and payment of claims for reimbursement from TRICARE for compounded prescription drugs.

65.    In general, TRICARE pays the pharmacy the average wholesale price for each ingredient in a compounded drug minus a negotiated discount.  The reimbursement amount also is based in part on the quantity of each ingredient in the compound.

66.    In order to obtain reimbursement from TRICARE for dispensing compounded drugs, pharmacies submit electronic data claims to ESI.  After receiving a claim, ESI adjudicates the claim on behalf of DHA.  If the claim is successfully adjudicated, then ESI sends the pharmacy authorization to dispense the drug.  ESI also sends DHA a data record of the claim, and, after a holding period, ESI pays the pharmacy on the claim from a government-established and government-funded account created for the purpose of paying TRICARE reimbursement claims.  Each claim

submitted to ESI for reimbursement of a compounded drug conveys, among other things, information about the patient, the prescriber, the pharmacy, the ingredients in the compounded drug, the price of the ingredients, and the date the prescription was filled.

67.     In order to qualify for reimbursement by TRICARE, a prescription drug must meet the following two requirements, among others.  First, the drug must be prescribed for either an FDA-approved indication or be supported by "reliable evidence show[ing] that any medical treatment . . . has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis."  32 C.F.R. § 199.4(g)(15).  And, second, the drug must be "medically or psychologically necessary [for] the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(1)(i).

68.     A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions.  32 C.F.R. § 199.9(a)(4).  Fraudulent situations include submitting TRICARE claims for non-covered or non-chargeable services, supplies, or equipment disguised as covered items.  *Id.* § 199.9(c)(2).  Abusive situations include the routine waiver of patient copayments and a pattern of claims for services which are not medically necessary or, if medically necessary, not to the extent rendered.  *Id.* § 199.9(b)(1), (3).

69.     TRICARE regulations specify that "[a]ll fraud, abuse, and conflict of interest requirements [in section 199.9] are applicable to the TRICARE pharmacy

19

benefits program." 32 C.F.R. § 199.21(p).  TRICARE's contract with ESI also incorporates the provisions of 32 C.F.R. § 199.

70.     Fraud or abuse by a pharmacy may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program.  32 C.F.R. § 199.9(b), (f).

71.     Active duty service members do not pay out-of-pocket for prescription drugs.  10 U.S.C. § 1074g(a)(2)(F).  All other TRICARE beneficiaries, such as retirees or family members of active duty service members, were at all relevant times responsible for sharing the cost of compounded drug prescriptions filled by a retail or mail-order pharmacy by paying a copayment.  *Id.* § 1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.  Copayments currently range from $7 to $53 for prescription drugs filled by a mail-order pharmacy.  *Id.* § 1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.

72.     To receive reimbursement from TRICARE for compounded drugs, a pharmacy must enter into a Provider Agreement with ESI, TRICARE's PBM.  A Provider Agreement is essential to TRICARE claims submission.  Having a valid Provider Agreement was required in order to submit claims for compounded drug reimbursement to TRICARE.  Alternatively, a pharmacy may instead contract with a pharmacy services administrative organization (PSAO) to contract with ESI on the pharmacy's behalf and provide other services that assist the pharmacy in working with ESI.

73.     From August 2011 through August 2017, Smart Pharmacy, on its own behalf and through several PSAOs, entered into Provider Agreements with ESI and used those agreements to obtain reimbursement from TRICARE for compounded drugs.

74.     On August 5, 2011, Defendant Balotin, as the authorized representative of Smart Pharmacy, Inc., executed a Provider Authorization obligating Smart Pharmacy, Inc., to comply with all terms and conditions in the Provider Agreement between ESI and Good Neighbor Pharmacy Provider Network, a PSAO.  On November 16, 2012, Balotin, as the authorized representative of SP2, LLC, executed the same Provider Authorization obligating SP2, LLC, to comply with all terms and conditions in the Provider Agreement between ESI and Good Neighbor PSAO.

75.     The Provider Agreement between ESI and Good Neighbor PSAO obligated Smart Pharmacy, Inc., and SP2, LLC, as pharmacies in the Good Neighbor PSAO network, to:

> a.  "be bound by and comply with the provisions of th[e] Agreement and all applicable laws, rules and regulations including, but not limited to, fraud waste and abuse laws . . . ."
>
> b.   "collect from [patients] . . . the applicable [c]opayment" and not "waive[] or discount[]" copayments unless directed by ESI.

76.     In the Provider Agreement that Good Neighbor PSAO entered into with ESI on behalf of Smart Pharmacy, Inc., and SP2, LLC, ESI expressly reserved the right to "refuse to pay any claim or [] reverse payment of any claim that is not submitted in accordance with the terms and conditions of th[e] Agreement."

77.     On October 19, 2015, Balotin, as the authorized representative for SP2, LLC, executed a PSAO Pharmacy Affiliation Authorization with Epic PSAO, which

obligated SP2, LLC, to comply with all terms and conditions in the Provider Agreement between ESI and Epic PSAO.  On October 30, 2015, the same Pharmacy Affiliation Authorization with Epic PSAO was executed by another Smart Pharmacy employee on behalf of Smart Pharmacy, Inc.

78.     The Provider Agreement between ESI and Epic PSAO obligated Smart Pharmacy, Inc., and SP2, LLC, as pharmacies in the Epic PSAO network, to:

    a.     "comply with all applicable laws, rules and regulations" including "all applicable federal and state anti-kickback laws."

    b.     "collect from [patients] . . . the applicable [c]opayment" and not "waive[] or discount[]" copayments unless directed by ESI.

79.     In the Provider Agreement that Epic PSAO entered into with ESI on behalf of Smart Pharmacy, Inc., and SP2, LLC, ESI expressly reserved the right to "refuse to pay any claim or [] reverse payment of any claim that is not submitted in accordance with the terms and conditions of th[e] Agreement."

80.     On September 30, 2016, Smart Pharmacy, Inc., executed a PSAO Pharmacy Affiliation Authorization with AccessHealth PSAO, which obligated Smart Pharmacy, Inc., to comply with all terms and conditions in the Provider Agreement between ESI and AccessHealth PSAO.  On August 9, 2017, Balotin executed the same Pharmacy Affiliation Authorization with AccessHealth PSAO on behalf of SP2, LLC.

81.     The Provider Agreement between ESI and AccessHealth PSAO obligated Smart Pharmacy, Inc., and SP2, LLC, as pharmacies in the AccessHealth PSAO network, to:

    a.     "comply with all applicable laws, rules and regulations" including "all applicable federal and state anti-kickback laws."

     b.   "collect from [patients] . . . the applicable [c]opayment" and not "waive[] or discount[]" copayments unless directed by ESI.

82.     In the Provider Agreement that AccessHealth PSAO entered into with ESI on behalf of Smart Pharmacy and SP2, ESI expressly reserved the right to "refuse to pay any claim or [] reverse payment of any claim that is not submitted in accordance with the terms and conditions of this Agreement."

83.     In addition, Smart Pharmacy, Inc., and SP2, LLC, agreed in its contracts with ESI and the PSAOs to comply with ESI's Provider Manual.

84.     The ESI Provider Manuals in effect during the period from December 2013 through 2016 required Smart Pharmacy to "ensure that the correct Copayment is charged" to the patient and "is not changed or waived."  The Manuals further warned that if ESI "becomes aware of any Copayment or cost-sharing discounts offered" by Smart Pharmacy, then Smart Pharmacy "may be subject to immediate termination" from ESI's provider network.

85.     The ESI Provider Manuals in effect during the period from August 2013 through 2016 also required Smart Pharmacy to be aware of and comply with all state and federal law, "including anti-kickback statutes and self-referral statutes."  The Manuals warned that "[f]ailure to demonstrate compliance with these laws may result in immediate termination by [ESI]."

**VII.   DEFENDANTS KNOWINGLY SUBMITTED, OR CAUSED TO BE SUBMITTED, FRAUDULENT REIMBURSEMENT CLAIMS TO FEDERAL HEALTH CARE PROGRAMS FOR TOPICAL COMPOUNDED PAIN CREAMS CONTAINING ARIPIPRAZOLE**

**A.   Aripiprazole Is a Powerful Antipsychotic Drug Not Indicated for Use in Pain Management or Topical Administration**

86.   Aripiprazole is an atypical antipsychotic drug that is FDA approved for administration orally or via intermuscular injection and is sold under the brand names Abilify, Abilify Maintena, and Aristada.

87.   The oral formulation of Abilify is FDA approved for treatment of (1) schizophrenia, (2) acute treatment of manic and mixed episodes associated with Bipolar I, (3) adjunctive treatment of major depressive disorder, (4) irritability associated with autistic disorder, and (5) treatment of Tourette's disorder.

88.   According to the drug's label, the recommended daily dose of Abilify is between 5–15 mg per day and the maximum dose is 30 mg per day.

89.   Abilify Maintena is an extended release injectable suspension for intramuscular use indicated for treatment of schizophrenia in adults and maintenance monotherapy treatment of bipolar I disorder in adults.

90.   Aristada is an extended release injectable suspension for intramuscular use indicated for treatment of schizophrenia in adults.

91.   Aripiprazole is not FDA approved in any form for treatment of pain. During the relevant time period, there were no clinical trials establishing that aripiprazole is safe or effective in treating pain.  The use for pain was not supported by a citation in any compendia.

24

92.     Aripiprazole is not FDA approved for administration in a topical formula. During the relevant time period, there were no clinical trials establishing that aripiprazole is safe or effective in a topical formula. The use for pain topically was not supported by a citation in any compendia.

93.     The FDA-approved label for all aripiprazole contains a boxed warning that "[e]lderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death.  [Aripiprazole] is not approved for the treatment of patients with dementia-related psychosis."

94.     The label for Abilify also contains a boxed warning that there is "[i]ncreased risk of suicidal thinking and behavior in children, adolescents, and young adults taking anti-depressants.  Monitor for worsening and emergency of suicidal thoughts and behaviors."  The boxed warning further instructs: "In patients of all ages who are started on antidepressant therapy, monitor closely for worsening, and for emergence of suicidal thoughts and behaviors.  Advise families and caregivers of the need for close observation and communication with the prescriber."

95.     The Abilify label warns that the drug may result in cerebrovascular adverse reactions in elderly patients with dementia-related psychosis, neuroleptic malignant syndrome, tardive dyskinesia, metabolic changes, orthostatic hypotension, leukopenia, neutropenia, agranulocytosis, seizures/convulsions, potential for cognitive and motor impairment, and suicide.  The Abilify label additionally discloses the following commonly observed adverse reactions for certain patient populations: akathisia, extrapyramidal disorder, tremor, restlessness, somnolence, insomnia, fatigue,

lethargy, sedation, dizziness, nausea, pyrexia, salivary hypersecretion, drooling,

constipation, vomiting, decreased or increased appetite, blurred vision, headache, and

nasopharyngitis.  The Abilify label contains additional information for pregnant women

(may cause extrapyramidal and/or withdrawal symptoms in neonates with third-

trimester exposure) and nursing mothers (discontinue drug or nursing, taking into

consideration importance of the drug to the mother).

96.     On May 3, 2016, the FDA issued a drug safety communication about

"new impulse-control problems associated with the mental health drug aripiprazole."

The FDA reported that "compulsive or uncontrollable urges to gamble, binge eat, shop,

and have sex have been reported with the use of the antipsychotic drug aripiprazole

(Abilify, Abilify Maintena, Aristada, and generics).  These uncontrollable urges were

reported to have stopped when the medicine was discontinued or the dose was reduced."

The May 3, 2016 drug safety communication further advised: "Patients and caregivers

should be alert for uncontrollable and excessive urges and behaviors while taking

aripiprazole. . . . Health care professionals should make patients and caregivers aware of

the risk of these uncontrollable urges when prescribing aripiprazole, and specifically ask

patients about any new or increasing urges while they are being treated with

aripiprazole."

**B.**     **Defendants Developed Topical Pain Creams Containing Aripiprazole To Increase Reimbursement from Federal Health Care Programs**

97.     Defendant Smart Pharmacy is a compounding pharmacy located in

Jacksonville, Florida.

98.     Compounding is the practice in which a licensed pharmacist or physician combines, mixes, reconstitutes, or alters two or more ingredients to create a customized medication tailored to the needs of an individual patient.  Historically, compounding has existed to assist patients whose medical needs are not met through mass-produced drugs. For example, patients with allergies to inert ingredients in a drug can receive an individually tailored compounded formulation that does not include those ingredients, or patients who are unable to swallow pills can receive a liquid formulation.

99.     Although compounding was historically reserved for people with unmet medical needs, Defendants Smart Pharmacy and Balotin devised compounded formulas intended for treatment of broad patient populations and marketed them to physicians. Smart Pharmacy and Balotin focused in particular on high-reimbursing topical pain creams, which made up the majority of its reimbursement from federal health care programs through December 31, 2016.

100.    Defendants Smart Pharmacy and Balotin, rather than physicians or other prescribers, developed the topical pain cream formulas that Smart Pharmacy dispensed. Defendants selected ingredients included in the formulas primarily based on the resulting profit margin, rather than the ingredients' safety or efficacy.

101.    During the relevant time period, Medicare Part D and TRICARE paid for compounded drugs based on the individual ingredients in the compound.  The amount of reimbursement for the compound was generally the sum of the amount paid for each of the individual reimbursable ingredients comprising the compound.  Including

multiple ingredients and expensive ingredients in compounded pain creams increased the revenue for each prescription.

102.    Until 2015, aripiprazole was available only as a brand name drug, Abilify. By April 2015, exclusivity and patent protection on Abilify had expired and the FDA granted approval for manufacturers to market generic aripiprazole.

103.    Shortly thereafter, Smart Pharmacy and Balotin developed topical pain cream formulas that contained aripiprazole.  The formulas were made up of crushed generic 30 mg aripiprazole tablets marketed for use orally.  The aripiprazole formulas for pain cream created by Smart Pharmacy and Balotin contained nearly five times the recommended dose indicated on Abilify's label and nearly two-and-a-half times the maximum dose.  In addition to this antipsychotic drug, the formulas also contained ingredients commonly found in topical pain creams, such as lidocaine and prilocaine, two topical anesthetics that numb the skin.

104.    Defendants Smart Pharmacy and Balotin created pain cream formulas containing aripiprazole because of the drug's high margins, rather than the safety or efficacy of the drug for treatment of pain.

105.    On June 16, 2015, a sales representative at ParMed Pharmaceuticals, LLC, a distributor, emailed Balotin a list of drugs that had been sold to compounding pharmacies in a quantity of 144 or greater since June 1, 2015.   The list contained Aripiprazole tablets in 10mg, 15mg, and 20mg amounts.   Balotin forwarded the email to the Director of Pharmacy and a Lab Operations Manager, noting "These products

have seen recent activity at ParMed.  [The sales representative] send This as a courtesy to see if there is anything new being used for Compounding."

106.   On July 29, 2015, the Lab Operations Manager for Smart Pharmacy emailed the sales representative at ParMed to inquire about the price of aripiprazole 30mg tablets.  She wrote: "Hot new product!! Aripiprazole 30mg tabs.  How low can we go?"  That same day the sales representative responded, "My Director of Pricing stated that Apotex [an aripiprazole generic] was just approved and will be entering the aripiprazole market sometime in the next month. . . . [T]he market is sure to erode atleast [sic] a little bit when Apotex enters."

107.   The Lab Operations Manager forwarded the message to Balotin, who responded, "In other words, the price will drop And we may see the high margin period next month with a Limited time until [insurers apply pricing controls].  Bring it on!!!"

108.   One day later, on July 30, 2015, at Balotin's direction, Smart Pharmacy began billing federal health care programs for topical compounded pain formulas containing aripiprazole.

109.   Smart Pharmacy and Balotin were aware that there were not randomized, controlled, or blinded clinical studies supporting the use of the drug to treat pain topically and that pain was not an approved use or a medically accepted indication for aripiprazole, as discussed in Section VII.C, *infra*.

110.   In August 2015, Smart Pharmacy created new prescription pads that included formulas for compounded pain drugs containing aripiprazole ("aripiprazole formulas").  An example of such a prescription pad is attached as Exhibit 1.  The

29

prescription pads did not disclose the drug's more commonly known branded name, Abilify.  A glossary on the back of the prescription pad described aripiprazole as "A partial dopamine agonist that plays a role in pain processing via mu opioids," which was a false or misleading description of aripiprazole.

111.    Between July 31, 2015, and December 31, 2016, Defendants Smart Pharmacy and Balotin submitted or caused to be submitted at least 10,810 claims for compounded drugs containing aripiprazole to Medicare Part D plans. Approximately 3,320 of such claims were submitted by Smart Pharmacy, Inc., and 7,490 were submitted by SP2, LLC.  The majority of the aripiprazole pain formula claims were reimbursed by Medicare Part D plans offered by Humana and UnitedHealthcare, or their affiliates.  Smart Pharmacy went from submitting no claims to Medicare Part D for aripiprazole compounds before July 30, 2015, to submitting approximately 400 claims in August 2015, for which they were paid approximately $800,000.

112.    Between July 30, 2015, and February 2, 2016, Defendants Smart Pharmacy and Balotin submitted or caused to be submitted approximately 1,510 claims for compounded drugs containing aripiprazole to the TRICARE program. Approximately 240 of such claims were submitted by Smart Pharmacy, Inc., and approximately 1,270 of such claims were submitted by SP2, LLC.

113.    The aripiprazole formulas were highly lucrative.  Smart Pharmacy routinely was paid thousands of dollars for each one-month supply of pain cream containing aripiprazole dispensed to a federal beneficiary.  On average, Medicare Part D plans paid Smart Pharmacy approximately $2,450 for a one-month supply of pain cream

containing aripiprazole, and TRICARE paid approximately $2,550 for a one-month supply of pain cream containing aripiprazole.

114.    Much of this cost was due to the inclusion of aripiprazole in the formula, particularly in the "high margin" months in 2015 just after the aripiprazole formulas were first introduced.  Aripiprazole was often the most expensive ingredient in the compound and was responsible for a significant amount of the reimbursement from federal health care programs.

115.    For example, Smart Pharmacy started billing a large number of claims to Humana Medicare Part D plans immediately after the aripiprazole formulas were first introduced at the end of July, 2015.  In the months after Defendants introduced the aripiprazole formulas, Humana Medicare Part D plans routinely paid $2,016 per fill just for the aripiprazole component of the compounded formulas.  In total, approximately 77 percent of the total reimbursement for each claim was attributable to the aripiprazole.

116.    Smart Pharmacy likewise started billing TRICARE for the aripiprazole formulas immediately after they were first introduced.  In the months after Defendants introduced the aripiprazole formulas, TRICARE routinely paid approximately $2,270 per fill just for the aripiprazole component of the compounded formulas.  In total, approximately 66 percent of the total reimbursement for each claim was attributable to aripiprazole.

**C.**   **Defendants Knew or Should Have Known that there Was No Evidence that Aripiprazole Was Effective for Treatment of Pain or Treatment of Pain Topically or Covered by Medicare Part D or TRICARE**

117.   Even as Smart Pharmacy was dispensing thousands of aripiprazole formulas to federal beneficiaries, Smart Pharmacy and Balotin understood that there was no meaningful clinical justification for use of aripiprazole to treat pain topically.

118.   Around the time that Smart Pharmacy began dispensing aripiprazole, a junior pharmacist attempted to find clinical support for use of aripiprazole in pain creams.  He was unable to find clinical trials or well-controlled studies supporting the use of aripiprazole for treatment of pain or administration topically.  He found two letters to the editors of medical journals that presented case reports on a total of nine patients—most or all of whom had psychological comorbidities—who reported improvements in chronic pain after taking aripiprazole orally.  He found nothing beyond this anecdotal support and no support for the use of the drug topically.  He circulated the results of his research to Balotin and other pharmacists and employees of Smart Pharmacy on June 30, 2015, the same day that Smart Pharmacy began billing federal health care programs for the aripiprazole topical formulas.

119.   On September 8, 2015, a little over a month after introducing the aripiprazole formulas, Smart Pharmacy and Balotin received an inquiry from United Compounding Management ("UCM") questioning the use of aripiprazole and several other ingredients in Smart Pharmacy's compounded pain formulas.

120.   UCM is a company that credentials and accredits compounding pharmacies in association with the National Association of Boards of Pharmacy.

Credentialing by UCM is a requirement to doing business with certain PBMs.  UCM performs ongoing monitoring of in-network compounding pharmacies on behalf of those PBMs, including data analytics and claims review.

121.    Smart Pharmacy had received accreditation through UCM, and in Balotin's email signature block in 2015 and 2016, he touted Smart Pharmacy as a "UCM Accredited Pharmacy."

122.    In the September 8, 2015 email, a UCM employee explained: "The ingredients listed below, specifically the aripiprazole and memantine, are not being utilized by any other pharmacy topically and we are not aware of any current clinical evidence.  Any insight you can provide into available literature or experience would be helpful should the need arise for us to explain these formulations to our clients [*i.e.*, PBMs].  These types of reviews are conducted across all pharmacies if uncommon ingredients are being submitted."

123.    Smart Pharmacy's junior pharmacist again searched for clinical support for the use of aripiprazole in topical pain cream.  On September 11, 2015, he reported to Balotin and another Smart Pharmacy pharmacist that he "could not find any actual topical pain relief data" on aripiprazole.

124.    On September 15, 2015, in response to UCM's request, a Smart Pharmacy pharmacist transmitted a document attempting to justify the use of aripiprazole in topical pain formulas.  The document cited the two case reports, a patent application, and a press release reporting that application of aripiprazole topically in animal studies did not result in skin irritation.

125.    On October 14, 2015, a conference call was held between UCM and Smart Pharmacy in which UCM's clinical pharmacist informed Smart Pharmacy and Balotin that the information provided did not support the use of aripiprazole in a topical pain cream.

126.    According to contemporaneous notes of the call, the UCM pharmacist emphasized that "We need to make decisions based on available literature," and questioned whether "there [is] any justification to show the efficacy profile of these [drugs]?"  He stated:

> [L]et's take Gabapentin, by the science, we know that it gets across the skin and the receptors are there, then I know that it will work topically.  If you take Duloxetine, we have no proof that it gets across the skin or gets into the tissues.   Abilify [*i.e.*, aripiprazole] is the same way, there is no data.  This hits the data hard, we all know that the medical literature changes daily, but we could not locate anything that supports or justifies the use of this topically.  Which makes it hard for me to sell this to the payors.

127.    According to contemporaneous notes of the call, Balotin acknowledged the lack of studies demonstrating that aripiprazole and other drugs under discussion "hit transdermal pain sites" but suggested that they should not "have to defend every single ingredient."  He said Smart Pharmacy would get UCM "some more information to help support the use of these drugs." Smart Pharmacy did not provide further information with respect to aripiprazole.

128.    On or around February 25, 2016, Smart Pharmacy learned that DHA added aripiprazole to a list of ingredients in compounded drugs that required prior authorization before being reimbursed, because aripiprazole was "[c]onsistently found in

34

topical pain related compounds, with no evidence to support effectiveness or safety in topical preparations." A prior authorization requires the prescriber to provide medical justification and obtain approval from TRICARE before Smart Pharmacy would be reimbursed for an aripiprazole formula. Smart Pharmacy did not receive payment on claims to TRICARE for aripiprazole after this date.

129. Despite Smart Pharmacy's and Balotin's knowledge by at least February 25, 2016, that TRICARE had determined there was "no evidence" to support the effectiveness or safety of aripiprazole in topical pain creams, Smart Pharmacy, with Balotin's knowledge and approval, continued to bill Medicare Part D plans for the aripiprazole formulas through the end of 2016.

**D.** **Defendants—Rather Than Prescribers—Determined When a Patient Should Receive a Formula Containing Aripiprazole Based Primarily on Reimbursement Considerations**

130. In addition to developing the aripiprazole formulas, Smart Pharmacy and Balotin, rather than prescribers, made a determination of when a patient with a pain cream prescription would receive a formula containing aripiprazole.

131. In particular, at all relevant times that Smart Pharmacy was dispensing the aripiprazole formulas, Smart Pharmacy employees in the billing department, at Balotin's direction, reviewed each prescription Smart Pharmacy received to determine whether the formula prescribed would result in the maximum reimbursement for a particular insurer. Smart Pharmacy and Balotin referred to the highest reimbursing formula as the "best option," "ideal option," "best formula," or "ideal formula." Billers were

instructed by Balotin and others to bill only for the "best" option, except in limited circumstances.

132.    Under this system, Smart Pharmacy generally dispensed an aripiprazole formula when doing so would result in the highest reimbursement.

133.    The system was described in a February 2, 2016 Smart Pharmacy manual for employees in the billing department, entitled the "Billing Reference Guide," which was created by senior members of the billing department as a training guide.  As this manual explains in a segment called "Life of the Prescription," when a prescription was received by Smart Pharmacy, billing technicians in the billing department determined the "ideal formula" for that patient's insurance.  If Smart Pharmacy determined that it could bill for the "best" option based on the existing prescription, it would do so.  If the existing prescription was not sufficient to allow Defendants to bill for the "best" option, then it would get passed to the "provider relations" department (previously called the "changes" department) "to get [a] formula change approved by faxing the prescriber for the ideal option."  Although this manual was dated February 2016, the same procedure was in effect for the entire period of time when Smart Pharmacy was dispensing the aripiprazole formulas.

134.    Smart Pharmacy utilized this process both when receiving a new prescription and when it was time to refill a prescription for compounded topical pain cream.  In the case of refills, Smart Pharmacy substituted a new formula for what had initially been dispensed if there was a new "best" option at the time of the refill based on changes in reimbursement or newly developed formulas.

135.    When a change was needed, Smart Pharmacy would attempt to contact the provider's office by phone or by faxing a change request to the provider's office. In seeking authorization, Smart Pharmacy frequently misrepresented to the provider's office that the originally prescribed formula was not covered by the patient's insurance, when in fact it was.  In some instances, Smart Pharmacy simply notified the provider's office that the prescription had been changed, without requesting authorization for the change.

136.    In many cases the prescription changes were not actually signed by the prescriber.  Instead, Smart Pharmacy employees would note on the prescription that the change had been approved by "verbal order" of the physician or a staff member in the physician's office.  At times, Smart Pharmacy falsely noted on the prescription that a "verbal order" had been received.

137.    When a prescription change authorization was not received in a timely fashion, billers were instructed to falsely write on the prescription that it had been authorized by a verbal order.  The Director of Sales would, at times, instruct employees in the billing department to falsely write on the prescription that a verbal order had been received or would himself falsely write that the verbal order had been received.  An employee was fired in February 2016 after complaining to her managers about Smart Pharmacy's practice of billing for medication before receiving authorization from the prescriber.

138.    Starting shortly after the July 30, 2015 introduction of the aripiprazole formulas, before Smart Pharmacy created new pre-printed prescription pads containing

the aripiprazole formulas and disseminated them to prescribers, Smart Pharmacy sent

facsimiles to hundreds of prescribers to change prescribed pain cream formulas to ones

that contained aripiprazole.

139.    In August and September 2015, the change requests indicated that "[t]he

compounded formula prescribed was not permitted under this patient's insurance. Please

consider the following substitution that is covered." Then Smart Pharmacy listed an

aripiprazole formula if that was the "best" option under the patient's insurance.

140.    In mid-September, Smart Pharmacy tweaked its outreach efforts and

began faxing truncated versions of the multi-formula prescription pad to prescribers with

this message: "The compounded formula prescribed was not permitted under this

patient's insurance. In an effort to optimize therapy, please sign below to approve one of

the following formulas. You will receive a fax indicating which formula was filled for

your patient."  Aripiprazole formulas were included in the listed options.

141.    The language in these facsimiles was false and misleading.  The

prescription changes were driven by an effort to increase reimbursement from a given

insurer, rather than being an effort to "optimize therapy."  Smart Pharmacy did not

disclose to prescribers that the changes that were being requested were in order to

maximize reimbursement.  Moreover, the representation that the "compounded formula

prescribed was not permitted under the patient's insurance" was often false, and Smart

Pharmacy could have billed the originally prescribed formula.

142.    For example, with respect to patients 3 and 4, discussed in Section IX,

*infra*, Smart Pharmacy made false representations that the original prescription was not

covered, when in fact the original formula was not rejected by the Part D plan.  With respect to Patient 3, Smart Pharmacy made the false representation on or around August 6, 2015, and increased its profits on this single prescription by $600 by switching from the original formula to the aripiprazole formula.   With respect to Patient 4, Smart Pharmacy made the false representation on or around August 24, 2015, and increased its profits on this single prescription by $400 by switching from the original formula to the aripiprazole formula.

143.   Indeed, Balotin recognized in a September 22, 2015 email to several pharmacists and employees in the billing department that the language in these facsimiles was "risky" because "it is not always the case" that insurance did not cover the prior formula.  Notwithstanding Balotin's acknowledgement that the language in the change requests was false, Balotin allowed the false statement to remain on change requests to prescribers after this date.

144.   To facilitate their ability to select the "best" option, Smart Pharmacy marketed the topical pain formulas to physicians and other medical professionals through pre-printed prescription pads that listed multiple different pain cream formulas. By including multiple formulas on the pad, Smart Pharmacy encouraged the prescribers to authorize multiple different formulas at the same time, purportedly allowing Smart Pharmacy to select a formula without requesting a change.  Smart Pharmacy developed such pre-printed prescription pads containing aripiprazole formulas in August 2015 and distributed them to prescribers.  An example of such a prescription pad is attached as Exhibit 1.

145.    The pre-printed prescription pads contained language purporting to give

Smart Pharmacy broad authorization to choose between listed formulas:

> Practitioner has indicated by numerical order his/her preference for
> dispensed compound. Pharmacy shall dispense first preference unless
> insurance requires alternate formulation. In this case, pharmacy will
> dispense alternate formula based on practitioners' numerical order of
> preference. Any formula may be dispensed by pharmacy per patient
> preference regardless of numerical order.

The multi-formula prescription pads used for the aripiprazole formulas contained pre-

printed numbers, reflecting Smart Pharmacy's preferred order of dispensing, rather than

the provider's choice.

146.    Smart Pharmacy encouraged physicians and other medical providers to

sign the bottom of the multi-formula prescription pads without selecting a particular

formula, purportedly to allow Smart Pharmacy to select the most effective formula that

was covered by the patient's insurance.  In reality, this gave Smart Pharmacy the greatest

flexibility in selecting the "best" option.  Smart Pharmacy told physicians that it had

"already worked out what formula will work based on the insurance."

147.    Defendants Smart Pharmacy and Balotin took steps to hide from insurers

the fact that they were was selecting the formulas.  For example, when the pharmacy

received a signed prescription with no formula selected, Balotin directed Smart

Pharmacy employees to mark-up the received prescription to indicate which formula

was dispensed.  For example, on September 30, 2015, Balotin wrote to an employee in

the billing department: "Are we having the biller circle the final billed Rx . . . ?  It is

necessary to circle the formula and quantity and refills so when it comes time for audit,

the choice made was clear."  Smart Pharmacy's Lab Operations Manager responded to

40

Balotin that, "Regardless, [a Smart Pharmacy employee] and I will make sure it's circled before turning it in for an audit. ☺"  By marking up the prescription in such a fashion, it would appear to an auditor that the prescriber had made an affirmative choice as to the formula dispensed, rather than the choice being made by Defendants.

148.    The staff in Smart Pharmacy's billing and changes departments were not pharmacists or medical doctors and did not have the necessary licenses or medical training to make a determination about whether a formula was clinically appropriate. *See* Florida Admin. Code r. 64B16-27.420(2) (indicating that the pharmacist may not delegate certain tasks, including "any other act that requires the exercise of a pharmacist's professional judgment").  Instead, the determination was being made primarily on reimbursement considerations.

149.    Balotin personally directed employees that the "best" option was to be billed.  For example, on August 7, 2015, he wrote to an employee in the billing department, "I would like to start at this point forward billing the correct formula 100% of the time and giving the patient exactly what We figured out would be Best."

150.    Balotin mandated that the billing department perform quality control of claims to ensure that the "best" option was billed.   For example, on November 18, 2015, Balotin wrote to an employee in the billing department: "What I would like is if you would . . . globally look at the claims on a report and sort by plan and look at it from this angle.  That is how I look at it.  All ins plan should have the same margin if not an exception."  (Emphasis in original.)

151.     Balotin also personally reviewed the claims that were billed at the end of the day to ensure that the "best" formula, often the aripiprazole formula, was being billed.  When Balotin found claims for something other than the "best" option, he required the billing department to reverse the claim and rebill for the "best" option.

152.     In order to streamline the review process, a Smart Pharmacy employee created and maintained a log of "exceptions," that is, claims that were billed for something other than the "best" option.  On October 26, 2015, for example, the employee wrote to Balotin and others that she had created an "excel spreadsheet marking down rx #'s that were at a lowered quantity or filled for an alternate formula than the best reimbursement spreadsheet along with the reasons why.  This way we can keep track of the claim review exceptions much easier. . . .  If there are questions for why we filled a certain formula or quantity this should make it easier to access the reason why."

153.     Smart Pharmacy, at Balotin's direction, employed these procedures to ensure that it was dispensing aripiprazole formulas when they were the "best" option. For example:

    a.     On August 5, 2015, a Smart Pharmacy employee in the finance department wrote to two employees in the billing department, copying Balotin, and noting that "Yesterday there were several NEW Tricare Pain RXs that were billed as SMT.  Can you look into those and get back to me.  I thought that all new Tricare pain would be converted to ACT."  ACT is an abbreviation that Smart Pharmacy used to refer to a topical pain cream formula containing aripiprazole.  The formula that was originally billed, SMT, did not contain aripiprazole and resulted in lower reimbursement.

    b.     On October 17, 2015, Balotin wrote to two Smart Pharmacy employees in the billing department, "Can you explain why we are

42

billing these different claims for Humana?  MH-GAT seems to be the best. But I'm seeing MC2 and MC3."  MH-GAT is a topical pain cream formula containing aripiprazole.  MC2 and MC3 did not contain aripiprazole and resulted in lower reimbursement.

c.  On October 19, 2015, Balotin wrote two Smart Pharmacy employees in the billing department, "It looks like we should be doing MH-GAT no ibu/no diclo for NSAID allergy.  Do you see that?  Look much better than MC3 combo."  MH-GAT is a topical pain cream formula containing aripiprazole.  MC3 did not contain aripiprazole and resulted in lower reimbursement.

d.  On October 22, 2015, Balotin wrote to two Smart Pharmacy employees in the billing department: "Is there a reason we would not do a better formula on this one?  Pt is 68 on Tricare."  One of the employees responded, "This one we are changing to MACT."  MACT is a topical pain cream formula containing aripiprazole.  The formula originally billed did not contain aripiprazole.

e.  On November 19, 2015, a Smart Pharmacy employee wrote to Balotin: "I found out last night that MGAT and MACT are reimbursing much better for WHP and MED D PacifiCare so we will be changing those."  MGAT and MACT are topical pain cream formulas containing aripiprazole.  PacifiCare is an insurer affiliated with UnitedHealthcare.

154.  Conversely, Smart Pharmacy did not dispense aripiprazole formulas in instances where they were determined not to be the "best" option.  For example, on August 7, 2015, a Smart Pharmacy employee responsible for responding to audits wrote to an employee in the billing department: "Since we spoke earlier, [the patient's prescription for] Formula ACT has been reversed.  Newest notes indicate that Formula NCT offers better reimb; therefore, they reversed/deleted Form ACT. . . . Now I have nothing to submit to the auditor. ☹ Do you think we can have [the sales representative] ask MD to sign both ACT and NCT and just say that we are going to try running both through ins and see which is better for the patient??  Not sure what other options we

have.  ☹☹☹"   ACT is a topical pain formula containing aripiprazole and NCT is a formula that does not contain aripiprazole.

155.    In November 2015, when Balotin became concerned that the reimbursement for aripiprazole would drop, he directed the Lab Operations Manager to make "a tremendous effort to find another drug to add to our formulas."  He recommended the Lab Operations Manager "build a formula with many drugs at one time and start narrowing this down to what reimburses."  By November 2016, when reimbursement for aripiprazole had dropped, Balotin told his management team that "[w]e need to make a change ASAP to Our formula selection if we are not being paid for ingredients."

**E.**    **Prescribers and Patients Were Frequently Unaware that the Pain Formulas Contained Aripiprazole and Prescribers Did Not Know of a Medical Rationale to Include the Drug in a Topical Pain Cream**

156.    As a result of the above process, it was Defendants Smart Pharmacy and Balotin—rather than a patient's physician or other medical provider—who ultimately selected which compounded pain cream formula was dispensed to the patient. Prescribers denied knowingly prescribing aripiprazole to their patients, were often not aware that the pain creams Smart Pharmacy dispensed to their patients contained aripiprazole, and were not aware of any medical rationale for providing topical pain creams containing aripiprazole to their patients.

157.    As examples, Doctors 1-6 are all listed as prescribers of aripiprazole compounded drugs dispensed by Smart Pharmacy in Medicare Part D and TRICARE claims.  Representative examples of such claims are discussed in Section IX, *infra*.  As

44

discussed in that section, these providers would not have knowingly signed the prescriptions had they known they contained aripiprazole, or would have questioned the use of the drug had they been aware that it was included in formulas dispensed to their patients.

158.    Because of the increased risk of death associated with aripiprazole use by elderly patients with dementia-related psychosis, Smart Pharmacy recognized that the drug should not be dispensed to patients above the age of 75.   As a result, Smart Pharmacy billers were instructed not to bill aripiprazole formulas for patients above this age.   Nevertheless, Smart Pharmacy dispensed compounded aripiprazole approximately 50 times to Medicare beneficiaries 76 years of age or older.   In at least 23 instances, the drug was dispensed to a Medicare beneficiary above the age of 80, and in at least three instances the drug was dispensed to a Medicare beneficiary above the age of 90.

159.    Likewise, many patients were unaware that they had been prescribed a compounded pain drug containing an atypical antipsychotic drug.   For example, Patients 1–5 were not aware that the compounded pain formulas they received contained aripiprazole.   Representative examples of claims associated with these patients are discussed in Section IX, infra.

160.    With respect to Patient 5, in April 2016, Patient 5 was informed that his wife, who at the time was on active duty with the United States Air Force, and their family were not going to be medically cleared for transfer to Guam because Patient 5's medical record revealed that he had been prescribed an antipsychotic medication. As a result, Patient 5 called Smart Pharmacy on or around April 26, 2016 and corresponded

with Smart Pharmacy by email on or around April 28, 2016.  Smart Pharmacy claimed

to have sent six shipments of pain cream to Patient 5, although Patient 5 claimed to have

only received two.  Smart Pharmacy refused to disclose how much TRICARE had paid

for his prescriptions.  With respect to the aripiprazole, Smart Pharmacy indicated that

"many drugs have primary and alternate uses beyond the original intended scope; in this

case, your physician prescribed, at different times, prescription drugs that are utilized in

ways different from the primary utility (i.e. the topical treatment of pain, not for

psychological issues)."  This incident resulted in substantial disruption to the service

member and her family and led to a delay in their transfer.

### F.    Defendants Increased Reimbursement by Dispensing Unreasonably Large Amounts of Pain Cream and Doses of Aripiprazole

161.    The high reimbursement was driven not only by aripiprazole's cost but

also by the large quantities of the drug dispensed by Smart Pharmacy in each fill.

162.    Smart Pharmacy's prescription pads for aripiprazole formulas had a

default setting of 12 fills of pain cream at 480 grams of pain cream per fill, which is

equivalent to approximately 1.06 pounds.  *See* Exhibit 1.  Each fill was intended to be a

one-month supply of pain cream.

163.    A prescription filled using the default amounts would result in over 12.5

pounds of pain cream containing aripiprazole being dispensed to a patient over the

course of the year, unless the patient's medical provider affirmatively requested a smaller

number of refills and/or a smaller quantity per fill.

164.    A 480-gram tube of pain cream—ostensibly a one-month supply—

typically contained 72 crushed 30 mg aripiprazole tablets, for a total of 2,160 mg of

aripiprazole in a one-month supply.  If a one-month supply contained 30 doses, then
each dose contained 72 mg of aripiprazole, which was nearly five times the
recommended oral dose and two-and-a-half times the maximum oral dose on Abilify's
label.

165.    By including large amounts of aripiprazole in the pain creams, Defendants
increased the amount of revenue received from federal health care programs, as the
amount that TRICARE and Medicare Part D Sponsors paid Smart Pharmacy depended
in part on the quantity of each ingredient.

166.    Although the quantity of aripiprazole in a dose of multi-ingredient pain
cream that Smart Pharmacy billed to Medicare Part D was submitted to the Part D
Sponsor, it was not contained in the PDE record the Part D Sponsor submitted to CMS,
because the PDE record only contained the total quantity of all the ingredients in the
pain cream, not the quantity of each individual ingredient.

167.    Even when prescribers affirmatively elected to authorize a formula for less
than 480 grams, Balotin directed that Smart Pharmacy request the formula be changed
to a 480 gram cream.  For example, on August 12, 2014, Balotin wrote to a Smart
Pharmacy employee in the billing department: "These 2 rxs were TRICARE billed at
60grams.  Is this correct?"  The employee responded, "Yes, it looks like they were refill
authorizations.  The patients get 60gms monthly.  I'll remind everyone to try for higher
quantities."

168.    Smart Pharmacy, at Balotin's direction, continued to request changes to
quantities notwithstanding complaints by providers.  For example, on November 5,

47

2015, a Smart Pharmacy employee in the billing department wrote to Balotin and others to note that three doctors had complained because they "would like for their patients to receive only 160 grams.  They told [Smart Pharmacy] that if they keep receiving requests for 480 grams they will stop writing for us."

169.   Likewise, patients would regularly complain that they were receiving too much compounded cream and that they did not want or need the amount of cream that was being shipped to them.

170.   Smart Pharmacy, at Balotin's direction, tracked creams dispensed for less than 480 grams in the exceptions spreadsheets discussed above.  Balotin personally requested that the billers change formulas written for less than 480 grams.

171.   As a result of these practices, approximately 81 percent of the aripiprazole compounded formulas Smart Pharmacy billed to Medicare Part D plans and 94 percent of the aripiprazole compounded formulas billed to TRICARE were for 480-gram fills of pain cream.

172.   It was unknown to Smart Pharmacy and Balotin whether application of the aripiprazole pain creams topically in the quantities dispensed by Smart Pharmacy introduced less than or more than five times the recommended dose of aripiprazole into the blood stream, or whether topical application introduced any aripiprazole into the blood stream at all.

173.   In order to create the compounded formulas, Smart Pharmacy had to purchase large quantities of generic aripiprazole tablets marketed for oral usage.  In November 2015, Smart Pharmacy, in requesting pricing information from McKesson

Corporation, represented that it anticipated using 179,000 tabs of aripiprazole, NDC

13811-0684-10, over the next three months.  An inventory manager at McKesson

questioned this forecast, because the drug's "projected usage [is] *__significantly__* higher than

the our [sic] usage *__network-wide__*.  I just need to know there is no mistake."  (Emphasis in

original.)  The inventory manager therefore requested that Smart Pharmacy confirm that

there was no mistake in the projection.  A Smart Pharmacy employee, with Balotin

copied, confirmed that the projected numbers were accurate.

174.   Smart Pharmacy and Balotin knew or should have known that 480 grams

of pain cream with aripiprazole was an excessive amount of pain cream to dispense in a

one-month supply for most patients.

175.   Starting in January 2015, UCM repeatedly notified Smart Pharmacy and

Balotin that dispensing 480-gram pain creams made Smart Pharmacy an outlier

compared to peer pharmacies and was not consistent with typical patient use.  UCM

additionally notified Smart Pharmacy and Balotin that Smart Pharmacy's high

reimbursements on compounded pain creams made it an outlier.  UCM therefore

recommended that Smart Pharmacy undertake measures to reduce costs, including

decreasing quantities and substituting high-cost ingredients for more modestly priced

ingredients.

176.   For example, in reports issued to Balotin on January 20 and 23, 2015,

UCM indicated that Smart Pharmacy, Inc.'s and SP2, LLC's practice of dispensing 480

grams per fill was "Outside of Industry Standards" and "Above industry peer

pharmacies and typical use."

177.    In a report issued to Balotin on July 7, 2015, UCM provided data showing that Smart Pharmacy's 2015 claims had a far larger percentage of compounded drug claims above 450 grams than comparator pharmacies.   That same day, Balotin called a UCM employee to express dissatisfaction over the report and rejected UCM suggestions to decrease quantities and substitute lower-cost alternatives for high-cost ingredients.

178.    On December 22, 2015, a UCM employee wrote to Balotin: "We would also like to take this time to stress how important it is to make strides to take the focus off of your pharmacies by implementing changes such as removing or changing cost-driving ingredients; decreasing the quantity on your pre-printed forms; and attempting to reach out to physicians to decrease quantities on topicals to under 480gms."

179.    Attached to the December 22, 2015 email to Balotin was a report that noted that SP2's average amount paid per prescription was $2,138.61, which was "**SIGNIFICANTLY HIGHER** than the average amount paid per prescription to UCM pharmacies." (Emphasis in original.)  UCM reported to Balotin that "[t]he majority of the Network Pharmacies have an average total paid amount per script between $0 and $500."   UCM therefore recommended that Smart Pharmacy "IMMEDIATELY identify potential cost-driving factors like quantity, concentration, and ingredient selection, and consider implementing cost management strategies." (Emphasis in original.)  UCM issued similar reports to Balotin concerning Smart Pharmacy, Inc., and SP2, LLC, with the same recommendation on or around the following dates: March 7, 2016, June 10, 2016, July 29, 2016, and November 1, 2016.

180.     On April 14, 2016, a UCM employee noted to Balotin: "the 480 gram scripts are making SMART/SP2 really obvious when I look at the Network as a whole."

181.     In sum, Balotin was the driving force in identifying aripiprazole as a drug for inclusion in topical pain formulas that Smart Pharmacy billed to Medicare Part D and TRICARE.  Balotin wanted the drug included in Smart Pharmacy's pain creams based on its reimbursement and instructed pharmacy staff to replace less lucrative formulas with aripiprazole formulas.  Balotin was informed by UCM that Smart Pharmacy's use of aripiprazole in topical pain formulas was unsupported by the medical literature.  He was also aware that Smart Pharmacy was purchasing and billing such large quantities of aripiprazole that the supplier questioned whether the orders were accurate.

**G.     Smart Pharmacy's Reimbursement Claims to Federal Health Care Programs for Aripiprazole Pain Formulas Were False or Fraudulent**

182.     Medicare Part D imposes limitations on what drugs are reimbursable under the program.  In particular, in order to qualify for reimbursement under Medicare Part D, a drug must be dispensed for a "medically accepted indication."  42 U.S.C. §§ 1395w–102(e)(1), (e)(4); 42 C.F.R. § 423.100 ("Part D drug," "Covered Part D drug"). A "medically accepted indication" means (1) a use approved by FDA or (2) uses supported by citations in one of three compendia.  *See* 42 U.S.C. §§ 1395w–102(e)(1), 1396r-8(g)(1)(B), (k)(6).

183.     In regulations implementing Part D, CMS explained that because compounded drugs are not FDA approved and generally do not have supporting references in the compendia, they do not meet the technical coverage rules for Part D.

51

*See* Medicare Program; Medicare Prescription Drug Benefit; Final Rule, 70 Fed. Reg.

4,194 at 4,231–32 (Jan. 28, 2005); Medicare Program; Changes to the Medicare

Advantage and the Medicare Prescription Drug Benefit Program for Contract Year

2012; 76 Fed. Reg. 21,432, 21,521–24 (April 15, 2011).  It explained however, that

some or all ingredients in a compounded drug may be covered, even if the finished

product is not.  *Id.*  In such circumstances, reimbursement is limited to the ingredients

that meet the definition of a covered Part D drug.  *Id.*  Ingredients that are not FDA

approved or uses that are not supported by a citation in a compendia are not

reimbursable.

184.    TRICARE likewise imposes limitations on reimbursement for prescription

drugs.  To qualify for reimbursement, the drug must be "medically or psychologically

necessary [for] the diagnosis and treatment of illness or injury."  32 C.F.R.

§ 199.4(a)(1)(i).  Accordingly, the drug must be dispensed for an FDA-approved

indication or for a use supported by "reliable evidence show[ing] that any medical

treatment . . . has been the subject of well-controlled studies of clinically meaningful

endpoints, which have determined its maximum tolerated dose, its toxicity, its safety,

and its efficacy as compared with standard means of treatment or diagnosis."  32

C.F.R. § 199.4(g)(15).

185.    During the relevant time, treatment of pain, or treatment of pain topically,

was not an FDA-approved use for aripiprazole.

186.     During the relevant time, the three compendia enumerated in 42 U.S.C. § 1396r-8(g)(1)(B) contained no citation supporting the use of aripiprazole for treatment of pain or treatment of pain topically.

187.     During the relevant time, the use of aripiprazole to treat pain, or treat pain topically, was not the subject of well-controlled studies of clinically meaningful endpoints, which had determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment.

188.     During the relevant time, aripiprazole was not medically necessary for the treatment of pain.

189.     Accordingly, the use of aripiprazole in topical creams to treat pain was not covered or reimbursable under the Medicare Part D or TRICARE programs, and the claims that Smart Pharmacy submitted or caused to be submitted to these programs were false or fraudulent claims under the FCA.

190.     Defendants Smart Pharmacy and Balotin knowingly submitted, or caused the submission of, false claims for reimbursement to Medicare and TRICARE for aripiprazole.

191.     By submitting such claims, Smart Pharmacy implicitly made false representations that the claims for aripiprazole were reimbursable under the Medicare Part D and TRICARE programs.

192.     In submitting claims for aripiprazole pain formulas to the Medicare Part D and TRICARE programs, Smart Pharmacy made representations about the goods and services provided.  These representations included, among other things, the identity

of the patient, the identity of the prescriber, the drug(s) dispensed, and the identity of the pharmacy dispensing the drug.  Examples of such representations are included in PDE claims data in Exhibit 2 and the TRICARE claims data in Exhibit 3.   Defendants did not disclose that the aripiprazole claims did not meet the reimbursement criteria set forth in 42 U.S.C. §§ 1395w–102(e)(1) and (e)(4), 42 C.F.R. § 423.100, or 32 C.F.R. § 199.4(a)(1)(i) and (g)(15).

193.    The claims were not true, accurate, and complete because they did not disclose that aripiprazole did not meet the requirements for reimbursement under the Medicare and TRICARE programs.  Smart Pharmacy made or used or caused to be made or used these false records or statements that were material to false or fraudulent claims to the Medicare and TRICARE programs.

194.    Smart Pharmacy's and Balotin's conduct rendered false the representations in Smart Pharmacy's provider agreements with Medicare Part D Sponsors and with ESI concerning the TRICARE program.  In addition, Smart Pharmacy's and Balotin's conduct rendered the Part D Sponsors' agreements with and attestations to CMS false.  Smart Pharmacy and Balotin made or used or caused to be made or used these false records or statements that were material to false or fraudulent claims to the Medicare and TRICARE programs.

**H.    Defendants Knew or Should Have Known of the Limitations on Reimbursement Under Medicare Part D and TRICARE**

195.    Smart Pharmacy and Balotin had actual knowledge of, recklessly disregarded, or acted with deliberate indifference to these limitations on coverage.

196.    Aripiprazole is not approved by the FDA for the treatment of pain or for topical administration.

197.    At the time when Smart Pharmacy first started dispensing aripiprazole formulas, Smart Pharmacy conducted research to determine whether there was clinical support for use of aripiprazole to treat pain topically.  Smart Pharmacy could not find such evidence, and did not find any meaningful evidence that aripiprazole in any formulation was effective to treat pain. Smart Pharmacy and Balotin were warned by a clinical pharmacist at UCM that there was no evidence supporting use of aripiprazole topically.  Smart Pharmacy and Balotin were likewise aware that aripiprazole had serious risks associated with its use.  They knew or should have known that, as dispensed, the drug was not covered by Medicare Part D or TRICARE.

198.    Knowing that topical use of aripiprazole to treat pain lacked any clinical support, Smart Pharmacy deceived prescribers into authorizing aripiprazole formulas by, for example, including a misleading definition of aripiprazole on the pre-printed prescription pads, encouraging prescribers to sign prescriptions without actually selecting a particular formula, and misleading prescribers into agreeing to an aripiprazole formula on the false pretense that the originally prescribed formula was not covered by the patient's insurance.

199.    After TRICARE imposed a prior authorization requirement on aripiprazole in compounded pain creams, Smart Pharmacy and Balotin did not endeavor to have prescribers complete a prior authorization to justify use of the drug in a pain cream.

200.    Defendants knew or should have known the coverage rules for compounded drugs and that claims for topical use of aripiprazole for treatment of pain was not a reimbursable use.

201.    The Medicare Prescription Drug Benefit Manual, a publicly available document,  explains that "Compounded prescription drug products can contain: (1) all Part D drug product components; (2) some Part D drug product components; or (3) no Part D drug product components.  Only costs associated with those compounds that satisfy the definition of a Part D drug are allowable costs under Part D because the compound products as a whole do not satisfy the definition of a Part D drug.  *See* Medicare Prescription Drug Coverage Manual, ¶ 10.4 (rev. 10) (Feb. 19, 2010).[1]  The Manual explains that, in order for a drug to meet the definition of a Part D drug, it must be dispensed for a "medically-accepted indication."  *Id.* ¶ 10.1.  The Manual further explains that a medically-accepted indication is "any use of a covered Part D drug which is approved under the Federal Food, Drug, and Cosmetic Act, or the use of which is supported by one or more citations included or approved for the inclusion in" the recognized compendia.  *Id.* ¶ 10.6.

202.    Similarly, the 2015 OptumRx Pharmacy Manual 8th edition[2] explains: "A Drug Product is part of Medicare Part D only if it is for a medically accepted indication

---

[1] Subsequent versions of the Medicare Prescription Drug Manual contain identical or substantially similar language to the language quoted in this and the following paragraphs.

[2] OptumRx is a PBM that is owned by UnitedHealthcare, and provides PBM services to UnitedHealthcare insurers.

56

as defined in the Medicare regulations and implementing guidance.  This definition includes prescribed uses supported by a citation included, or approved for inclusion, in one (1) of the following four (4) compendia: American Hospital Formulary Service Drug Information[,] United States Pharmacopeia Drug Information or its successor publication[,] DRUGDEX Information System[, or] National Comprehensive Cancer Network (NCCN)[.[3]]  Based on this regulatory definition, indications supported in peer reviewed medical literature are not 'medically accepted' if they are not yet included, or approved for inclusion, in one of the compendia.  Therefore, the use of a Drug Product for such indications would not meet the definition of a Medicare Part D Drug Product and the Drug Product would not be a Covered Prescription Service under the Benefit Plan, even if the Member's Prescribing Physician states that the Drug Product is medically necessary."  The manual further explains: "All federal legend Drug Products and raw or bulk chemicals submitted in the Compounded Drug Claim fields must be . . . Used for a medically accepted indication to treat a covered condition, illness or injury."

203.    Balotin received a copy of the OptumRx Pharmacy Manual.

204.    In the Humana 2014 provider manual, it is explained that "In order for a drug to be included in the Part D benefit, the product must satisfy the definition of a Part D drug and otherwise not be excluded."

205.    Balotin received a copy of the Humana 2014 provider manual.

---

[3] The fourth compendia listed above is only applicable with respect to drugs used in an anticancer chemotherapeutic regimen.

I.      **Medicare Part D and TRICARE Reimbursement Criteria Are Material to the Government's Decision to Reimburse Prescription Drug Claims**

206.    The Medicare Part D and TRICARE coverage requirements set forth in 42 U.S.C. §§ 1395w–102(e)(1) and (e)(4), 42 C.F.R. § 423.100, and 32 C.F.R. § 199.4(a)(1)(i) and (g)(15) are material to the Government's decision to reimburse prescription compounded drug claims.

207.    Claims for prescription drugs that do not meet the definition of a "medically accepted indication" are not reimbursable under Medicare Part D coverage rules.  42 U.S.C. §§ 1395w–102(e)(1), (e)(4); 42 C.F.R. § 423.100 ("Part D drug," "Covered Part D drug").  The requirement that a drug be prescribed for a "medically accepted indication" is an express condition of payment under the Medicare Part D program.  *Id.*

208.    The requirement that a drug be prescribed for a "medically accepted indication" goes to the essence of the bargain under the Medicare Part D program and is central to the balance Congress struck between expanding access to prescription drugs through the Part D program and containing costs.

209.    CMS did not have actual knowledge that Smart Pharmacy was submitting claims for drug ingredients that did not have a "medically accepted indication."  The PDE data the government receives from Medicare Part D Sponsors for compounded drugs does not include information on the diagnosis for which the drug is being dispensed or the route of administration.

210.    CMS did not have actual knowledge that Smart Pharmacy was submitting claims for pain creams containing multiple times the maximum daily oral dose of

aripiprazole.  The PDE record did not contain the quantity of the aripiprazole component of the compound.

211.    The Medicare Part D program does not routinely or knowingly pay for drugs that are not dispensed for a "medically accepted indication."

212.    CMS and HHS-OIG have repeatedly emphasized that only ingredients in a compounded drug that independently meet the definition of a Part D drug (including that they were dispensed for a medically accepted indication) are reimbursable under Part D.  *See Medicare Program; Medicare Prescription Drug Benefit, Final Rule*, 70 Fed. Reg. 4194-01, at 4231–32, 4261 (Jan. 28, 2005); *CMS Release, Part D/Part D Excluded Drugs* (April 19, 2006), *available at* https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/downloads/PartDDrugsPartDExcludedDrugs.pdf; Medicare Prescription Drug Coverage Manual, ¶ 10.4 (rev. 10) (Feb. 19, 2010); *Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program for Contract Year 2012*, 76 Fed. Reg. 21,432, 21,521–524 (April 15, 2011) (only costs associated with ingredients of a compounded product that satisfy the definition of a Part D drug are allowable costs under Part D); *HHS-OIG Report: High Part D Spending on Opioids and Substantial Growth in Compounded Drugs Raise Concerns*, OEI-02-16-00290 (2016), *available at* https://oig.hhs.gov/oei/reports/oei-02-16-00290.pdf (With respect to compounded drugs, "Part D covers only the ingredients that independently meet the definition of a Part D drug.").

213.    The TRICARE coverage requirements in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15) are material to the government's decision to reimburse a pharmacy for compounded prescription drugs under the TRICARE program.

214.    Claims for prescription drugs that do not meet the coverage requirements in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15) are not reimbursable by TRICARE.  The coverage requirements in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15) are express conditions of payment by the TRICARE program.

215.    The coverage requirements in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15) go to the essence of the bargain under the TRICARE program and ensure that the TRICARE program reimburses only for drug uses that are supported by scientific evidence.

216.    As of February 3, 2016, TRICARE added Aripiprazole 30mg tablets to a prior authorization screening list because they were "[c]onsistently found in topical pain related compounds, with no evidence to support effectiveness or safety in topical preparations."  TRICARE took this action directly in response to submission of aripiprazole claims by Defendants.  TRICARE has not paid claims submitted by Defendants for aripiprazole compounded drugs following the imposition of this prior authorization regime.

217.    Defendants' conduct, as alleged above, was not a minor or insubstantial violation of the Medicare Part D and TRICARE coverage requirements, and instead was a systematic effort to bill federal healthcare programs for unproven, uncovered, and non-reimbursable drug uses, resulting in tens of millions of dollars of damages.

218.    The United States routinely brings enforcement actions under the FCA to recover money paid for drugs that do not meet the reimbursement requirements of federal health care programs, such as the requirement of a "medically accepted indication" under Part D.  *See, e.g.*, Press Release, U.S. Department of Justice, Bristol-Myers Squibb to Pay More Than $515 Million to Resolve Allegations of Illegal Drug Marketing and Pricing (Sep. 28, 2007) *available at*

https://www.justice.gov/archive/opa/pr/2007/September/07_civ_782.html

(settlement resolving allegations by the United States that Bristol-Meyers Squibb engaged in "off-label" marketing of the drug Abilify).

219.    A reasonable person would conclude that the Medicare Part D and TRICARE coverage requirements are material to the government's payment decision.

220.    Defendants had actual knowledge, recklessly disregarded, or acted in deliberate indifference to whether the Medicare Part D and TRICARE coverage requirements were material to the government's payment decision.

## VIII.   DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED REIMBURSEMENT CLAIMS TO FEDERAL HEALTH CARE PROGRAMS FOR WHICH THEY DID NOT COLLECT A COPAYMENT

### A.   Defendants Knowingly Submitted or Caused to be Submitted Claims to Federal Health Care Programs for which They Failed to Collect Copayments

221.    Smart Pharmacy, at Balotin's direction, routinely waived, reduced, or failed to collect complete patient copayment amounts in order to maximize reimbursement from federal health care programs.  This was true with respect to both compounded drugs that contained aripiprazole and those that did not.

222.    Patient copay obligations exist to encourage efficient use of federally reimbursed health care products by health care providers and consumers.  Defendants signed agreements stating that they would not waive, rebate, or discount copayment amounts for Medicare Part D beneficiaries except where expressly allowed under law. Similarly, the Provider Agreements permitting Smart Pharmacy to participate in the TRICARE program obligated Smart Pharmacy to collect the applicable copayment from patients and not waive or discount copayments unless directed by ESI.  Despite these obligations, Smart Pharmacy, under Balotin's direction, waived copayment amounts, reduced copayment amounts, and failed to make reasonable good faith efforts to collect copayment amounts.

223.    Between January 2011 and May 2016, Smart Pharmacy failed to collect a full copayment for a total of approximately 10,615 Medicare Part D claims, resulting in approximately a 48 percent waiver rate by amount paid.  With respect to TRICARE, between January 2011 and May 2016, Smart Pharmacy failed to collect a full copayment for approximately 3,360 TRICARE claims, resulting in approximately a 25 percent waiver rate by amount paid.

224.    Much of Smart Pharmacy's business involves shipping compounded drugs to patients via mail or other forms of delivery.  During much of the relevant period, Smart Pharmacy routinely shipped compounded drugs to patients without first requiring patients to pay their copayments.  Smart Pharmacy routinely waived or reduced patient co-payment amounts, often charging the balance to a "house" account.

225.    Even when Smart Pharmacy began including a bill with the compounded drugs, there were no consequences if the patient failed to pay the copayment.  For example, Smart Pharmacy routinely shipped compounded drugs to patients who had an unpaid copayment balance, instead of requiring that patients pay the balance before sending additional prescriptions.  Likewise, copayment balances were routinely written off, rather than being sent to collections.

226.    Patients were not always informed of the copayment amount before the drug was mailed.  Patients who complained about patient copayments were informed that they did not need to pay the copayment amount or that Smart Pharmacy would not take action if they did not pay the copayment amount.

227.    Starting in December 2014 and January 2015, Smart Pharmacy began taking additional steps to create the appearance of compliance with copayment collection requirements.  For example, Smart Pharmacy requested that a consultant create "a system . . . to send mass emails to . . .  delinquent accounts."  But, in fact, Balotin intended to "take a very light approach to collecting money" and "want[ed] this to be a friendly email since we are simply asking for co-pays as a requirement."

228.    Multiple former Smart Pharmacy employees raised concerns about Smart Pharmacy's copayment practices to Balotin and other individuals in management at Smart Pharmacy.

229.    For example, an employee in the shipping department from June 2014 to October 2015 questioned the practice of allowing patient accounts to accumulate $400 in

debt, while continuing to ship compounded medications, asking "if a [patient] has never made a payment at what point do we do something about it"?

230.    Smart Pharmacy's Director of Operations emailed Balotin on April 12, 2016 regarding a draft "standard operating procedure" for copayment collection. She noted that Smart Pharmacy did not "refer [] patient[s] to collections if their outstanding balance has not been collected within 180 days after fill" and recommended striking this language "since this is not our policy."

231.    Because patients did not pay the co-pays, the computer system kept totaling the unpaid monies as an outstanding patient balance, sometimes totaling thousands of dollars.  Management wrote off many of these patient balances, even though no attempt was made to collect the funds.  When Smart Pharmacy began to send statements for account balances, patients complained because they had previously been told that they would not have to pay a copay.

232.    Smart Pharmacy, Inc., in a credentialing application to UCM on November 24, 2014, indicated that the pharmacy does not "ever waive or reduce member copayments" and does not "utilize a copayment assistance program."  Smart Pharmacy also represented that it was not "involved in any current litigation related to the pharmacy or the practice of pharmacy," despite the fact that it was at the time defending counter-claims and was in settlement discussions with Medco Health Solutions, Inc., concerning its copayment waiver practices.   The document was signed and acknowledged by Balotin on behalf of Smart Pharmacy Inc.

233.    UCM instructed Smart Pharmacy "to collect copayments up front and only invoice on a very infrequent basis."  Nonetheless, Smart Pharmacy utilized invoicing as a routine part of its business.

234.    Smart Pharmacy's copay practices also were the subject of a CVS Caremark audit of copayment collection.  After reviewing the audit findings, a Smart Pharmacy employee reported to Balotin on December 4, 2014:  "[O]ut of the total of 57 RXs, 20 payments were received (some pts paid at the time of p/u and others sent in a payment.) <u>ALL</u> payments were in the amount of $25 each after they were Smarted down.  As for the rest, they were either charged to the House Acct (14 rxs), reduced to $0.00 (7 rxs), 'charged to pt's account' (but an account was never created-11 rxs), and 3 were within the 2010 timeframe when the server fried, so I was not able to pull anything up for those."  In other words, for each of the 54 prescriptions for which Smart Pharmacy retained records, copayments were entirely waived or reduced (*i.e.*, "Smarted down").

235.    On February 12, 2015, a Smart Pharmacy employee sent an email to Balotin noting the result of the CVS Caremark audit finding a discrepancy of approximately $275,000, with the "Main discrepancy" being "Copay collection (rxs were smarted down to $25 or $15)." The employee noted that 23 "federally funded programs" were affected by the discrepant claims.

236.    Even after Smart Pharmacy implemented a standard operating procedure regarding patient copayments, the pharmacy still shipped medication to patients without requiring prior payment of the copayment amount due.  For example, the Collecting

Patient Pay Amounts standard operating procedure, effective on August 19, 2016, reflects that medication could be sent with an invoice, that patients could enroll in a payment plan requiring only a $15.00 payment within thirty days of receiving a prescription (and then monthly payments of $15.00), and that the patient balances of $400.00 were permitted.

237.    By waiving copayment amounts, reducing copayment amounts, and failing to make reasonable good faith efforts to collect copayment amounts, Smart Pharmacy was able to continue billing federal healthcare programs for compounded pain creams without the double-check that exists when patients share in the financial responsibility that typically comes with filling a prescription.

**B.      Routine Waiver of Patient Copayments Violates the Anti-Kickback Statute, and Resulting Claims to Federal Health Care Programs Are False**

238.    Smart Pharmacy, with Balotin's knowledge and approval, knowingly and willfully paid remuneration to Medicare and TRICARE patients to induce the patients to purchase compounded drugs by waiving, reducing, or failing to collect patient copayments necessary to buy the drugs.  This conduct violated the AKS, 42 U.S.C. 1320a-7b(b)(2).

239.    Smart Pharmacy and Balotin submitted, or caused to be submitted, the resulting claims for reimbursement to Medicare and TRICARE although it had waived, reduced, or failed to collect patient copayments for such claims.

240.    Such claims are, as a matter of law, *per se* false or fraudulent.  42 U.S.C § 1320a-7b(g).

241.    The claims are also false because, in submitting or causing the submission of such claims, Smart Pharmacy and Balotin implicitly represented that the claims did not result from violations of the AKS.

242.    In submitting claims for compounded pain creams to the Medicare Part D and TRICARE programs, Smart Pharmacy made representations about the goods and services provided.  These representations included, among other things, the identity of the patient, the identity of the prescriber, the drug(s) dispensed, and the identity of the pharmacy dispensing the drug.  Based on this information, the Part D Sponsors and TRICARE informed Smart Pharmacy of the copayment the pharmacy was obligated to collect from the patient.  Examples of such representations are included in PDE claims data in Exhibit 4 and the TRICARE claims data in Exhibit 5.

243.    The claims were not true, accurate, or complete because they did not disclose a violation of the AKS resulting from Smart Pharmacy's failure to collect patient copayments.  The claims are therefore a false record that Smart Pharmacy and Balotin created, used, or caused to be created or used to pay the false claims alleged herein.

244.    The representations of compliance with the AKS made by the Part D Sponsors and downstream entities were false because the claims resulted from an illegal kickback.  The representations were false records that Smart Pharmacy and Balotin caused to be used to pay the false claims alleged herein.

245.    Smart Pharmacy's and Balotin's conduct rendered false the representations in Smart Pharmacy's provider agreements with Medicare Part D

Sponsors and with ESI concerning the TRICARE program.  In addition, Defendants'

conduct rendered the Part D Sponsors' agreements with and attestations to CMS false.

Defendants made or used or caused to be made or used these false records or statements

that were material to false or fraudulent claims to the Medicare and TRICARE

programs.

**C.    Collection of Copayments is Material to the Government's Payment Decision**

246.    Compliance with the AKS is material to the government's decision to

reimburse a pharmacy for prescription drugs under Medicare Part D and the TRICARE

program.

247.    The AKS is a criminal statute specifically designed to prevent fraud on

federal healthcare programs such as Medicare and prevent excessive costs to the

Medicare program resulting from all forms of illegal inducements.

248.    Defendants' compliance with the AKS goes to the very essence of the

bargain between Defendants and the government.  When the government pays a

pharmacy for drugs prescribed for a Medicare Part D or TRICARE patient, it does so

with the expectation that the prescription is not compromised by illegal kickbacks, which

may taint medical decision-making and increase health care costs.

249.    The centrality of the AKS to the claims payment decision is demonstrated

by the fact that Congress has determined that any Medicare claim "that includes items

or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim

for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

250.    Entities submitting claims to Medicare are subject to mandatory exclusion

from Medicare by HHS-OIG if criminally convicted of an AKS violation, *see, e.g.*, 42

U.S.C. § 1320a-7(a)(l), and subject to permissive exclusion if HHS-OIG determines that

the provider "has committed an act" described in the AKS, 42 U.S.C. $ 1320a-7(b)(7).

DHA likewise has authority to suspend providers for fraud and abuse, including the

payment of kickbacks.  32 C.F.R. § 199.9(b), (f).

251.    AKS violations are not minor, insubstantial, or mere technicalities that are

not relevant to the government's payment decisions.

252.    The United States regularly enforces the AKS and pursues FCA liability

based on underlying violations of the AKS.  In particular, in addition to seeking redress

through this civil litigation, it has pursued matters related to the waiver of patient

copayments.  *See, e.g., United States ex rel. Medrano v. Diabetic Care Rx, LLC*, No. 15-cv-

62617 (S.D. Fla.); *United States ex rel. Strunck v. Mallinckrodt ARD LLC*, No. 12-cv-0175

(E.D. Pa.).

253.    DHA and CMS were unaware of Smart Pharmacy's and Balotin's

conduct during the relevant period.

254.    A reasonable person would conclude that the AKS is material to the

government's payment decision.

255.    Defendants had actual knowledge, recklessly disregarded, or acted in

deliberate indifference to whether the AKS was material to the government's payment

decision.

## IX.   REPRESENTATIVE ARIPIPRAZOLE CLAIMS

256.    Smart Pharmacy and Balotin knowingly submitted or caused to be submitted at least 10,810 paid false claims for aripiprazole topical pain formulas to Medicare Part D and approximately 1,510 paid false claims for aripiprazole topical pain formulas to the TRICARE program.  Each of these claims were false or fraudulent under the False Claims Act for the reasons discussed in Section VII, *supra*.

257.    The following are representative examples of false claims that Smart Pharmacy and Balotin submitted or caused to be submitted to Medicare Part D and TRICARE.

### A.    Aripiprazole Example 1

258.    Patient 1 is a Medicare Part D beneficiary insured through Humana.

259.    On or around May 19, 2015, Dr. A wrote a prescription for patient 1 for eighty grams of topical pain cream consisting of ketoprofen, lidocaine, and cyclobenzaprine.  This formula was a low reimbursing "cash" formula developed by Smart Pharmacy for patients paying out of pocket.  Smart Pharmacy dispensed this compounded drug to patient 1 five times between May 21, 2015, and August 21, 2015, and patient 1 was charged $25 each time.  Because the formula was a "cash" formula, no amount was charged to Humana.

260.    On or around September 19, 2015, Smart Pharmacy created a change request for patient 1 listing eight different pain formulas, including two containing aripiprazole.  The aggregate size of the compounded drug was 480 grams, over six times the amount originally prescribed.  By changing from a cash formula to an aripiprazole

formula, Smart Pharmacy increased its profits on a September 25, 2015 fill of this prescription by over $1,100 above the cash formula dispensed on August 21, 2015.

261.    Smart Pharmacy records indicate that Dr. A signed this multi-formula prescription change request on or around September 24, 2015.   Dr. A, however, was not aware that two of the formulas on the change request for patient 1 contained aripiprazole. Dr. A was not aware of any evidence that aripiprazole has any use in a topical application for pain, and believes the inclusion of aripiprazole in the pain formulas was not of any clinical value.  Had Dr. A known the drug was included in the compounded formula, he would not have signed it.

262.    Between September 25, 2015, and February 29, 2016, Smart Pharmacy, Inc., submitted seven false claims for reimbursement to Humana for dispensing aripiprazole pain formulas to patient 1, and was paid on the claims.  As a result, Smart Pharmacy knowingly caused Humana to submit false PDE claims to CMS based on information in Smart Pharmacy, Inc.'s original claims.  Selected information from the PDE claims for patient 1 is attached in Exhibit 2.

263.    These claims were false because they did not meet the reimbursement criteria in 42 U.S.C. §§ 1395w–102(e)(1), (e)(4) and 42 C.F.R. § 423.100.

**B.    Aripiprazole Example 2**

264.    Patient 2 is a Medicare Part D beneficiary insured through UnitedHealthcare.

265.    On or around April 21, 2016, Dr. B wrote a prescription for patient 2 for topical pain cream consisting of lidocaine, prilocaine, cyclobenzaprine, montelukast,

diclofenac, ibuprofen, duloxetine, and dimethyl sulfoxide.   The prescription was submitted to Smart Pharmacy, but it never dispensed or billed this formula.

266.    On or around April 28, 2016, Smart Pharmacy created change request for patient 2 listing eight different pain formulas, including two containing aripiprazole.

267.    The change request does not bear Dr. B's signature, and instead contains a notation that the change was approved by verbal order of one of Dr. B's assistants.  Dr. B was not aware that aripiprazole was an ingredient in any prescriptions that he wrote that were filled by Smart Pharmacy.  Dr. B does not believe that aripiprazole has any effect in pain control, and is not aware of any study showing that aripiprazole was effective in pain control.  According to Dr. B, aripiprazole was not an appropriate drug for patient 2.  Dr. B would not have knowingly authorized the prescription for an aripiprazole pain cream without first seeing evidence and studies showing that it was effective for pain as a topical medication.

268.    Between April 28, 2016, and October 31, 2016, SP2, LLC, submitted eight false claims for reimbursement to UnitedHealthcare for dispensing aripiprazole pain formulas to patient 2, and was paid on the claims.  As a result, Smart Pharmacy knowingly caused UnitedHealthcare to submit false PDE claims to CMS based on information in SP2, LLC's original claims.  Selected information from the PDE claims for patient 2 is attached in Exhibit 2.

269.    These claims were false because they did not meet the reimbursement criteria in 42 U.S.C. §§ 1395w–102(e)(1), (e)(4) and 42 C.F.R. § 423.100.

C.     **Aripiprazole Example 3**

270.    Patient 3 is a Medicare Part D beneficiary insured through Humana.

271.    On or around March 19, 2015, Dr. C wrote a prescription for three pain creams, none of which contained aripiprazole.   On April 15, 2015, Smart Pharmacy changed the prescription to a formula containing Lidocaine, Prilocaine, Celecoxib, Duloxetine, Cyclobenzaprine, and Diclofenac.  Smart Pharmacy dispensed this compounded drug to patient 3 four times between April 16, 2015, and July 10, 2015.

272.    On or around August 6, 2015, Smart Pharmacy created a change request for patient 3 to receive a compounded topical pain cream containing aripiprazole.  The top of the new prescription was addressed to Dr. C and indicated: "The compounded formula prescribed was not permitted under this patient's insurance.  Please consider the following substitution that is covered."  This statement was false.  The previous prescription for patient 3 was not rejected by Humana on or around August 6, 2015.  By switching to this formula, Smart Pharmacy increased its profits on an August 6, 2015 fill of this prescription by over $600 above the amount received from the July 10, 2015 fill for patient 3.

273.    The August 6, 2015 change request bears a signature that Dr. C claims does not belong to him or any of his staff.  Dr. C does not believe that aripiprazole has an application in pain management and is not aware of any study showing that aripiprazole is effective in pain management. Dr. C was not aware that topical formulas dispensed to his patients contained aripiprazole and had he known, he would have questioned Defendants on its inclusion in the formulas.

274.   Between August 6, 2015, and December 23, 2015, Smart Pharmacy, Inc., submitted six false claims for reimbursement to Humana for dispensing aripiprazole pain formulas to patient 3 and was paid on the claims.  Smart Pharmacy knowingly caused Humana to submit false PDE claims to CMS based on information in Smart Pharmacy, Inc.'s original claims.  Selected information from the PDE claims for patient 3 is attached in Exhibit 2.

275.   These claims were false because they did not meet the reimbursement criteria in 42 U.S.C. §§ 1395w–102(e)(1), (e)(4) and 42 C.F.R. § 423.100.

**D.   Aripiprazole Example 4**

276.   Patient 4 is a Medicare Part D beneficiary insured through Humana.

277.   On or around September 24, 2014, Dr. D wrote a prescription for topical compounded pain cream containing Amantadine, Gabapentin, Baclofen, Clonidine, Magnesium, and Duloxetine.   On or around April 15, 2015, Smart Pharmacy changed the formula to one containing Lidocaine, Prilocaine, Celecoxib, Duloxetine, Cyclobenzaprine, and Diclofenac.  Smart Pharmacy dispensed this compounded drug to Patient 4 three times between April 22, 2015, and July 10, 2015.

278.   On or around August 24, 2015, Smart Pharmacy created a change request for Patient 4 to receive a compounded topical pain cream containing aripiprazole.  The new prescription was addressed to Dr. D and indicated that "The compounded formula prescribed was not permitted under this patient's insurance.  Please consider the following substitution that is covered."   This statement was false.  The previous prescription was not rejected by Humana on or around August 24, 2015.   By making

this change, Smart Pharmacy increased its profits on an August 27, 2015 fill of this prescription by over $400 above the July 10, 2015 fill for patient 4.

279.     Smart Pharmacy records indicate that Dr. D signed the change request. Dr. D was not familiar with aripiprazole being used as a topical medication, and does not know of any study in which it has been used as a topical pain formula.  Dr. D does not believe that there are grounds for including aripiprazole in a topical medication.  Dr. D was unaware that aripiprazole was in a prescription that she signed, and she would have not signed the prescription had she known that it was included in the formula.

280.     Between August 27, 2015, and December 24, 2015, Smart Pharmacy, Inc., submitted four false claims for reimbursement to Humana for dispensing aripiprazole pain formulas to patient 4, and was paid on the claims.  As a result, Smart Pharmacy knowingly caused Humana to submit false PDE claims to CMS based on information in Smart Pharmacy, Inc.'s original claims.  Selected information from the PDE claims for patient 4 is attached in Exhibit 2.

281.     These claims were false because they did not meet the reimbursement criteria in 42 U.S.C. §§ 1395w–102(e)(1), (e)(4) and 42 C.F.R. § 423.100.

## E.  Aripiprazole Example 5

282.     Patient 5 is a TRICARE beneficiary.

283.     On or around May 5, 2015, Dr. E signed a prescription for topical compounded pain cream containing Gabapentin, Flubiprofen, Lidocaine, Clonidine, Loperamide, Duloxetine, Cyclobenzaprine, and dimethyl sulfoxide.  Smart Pharmacy dispensed this compounded drug to Patient 5 one time on or around May 6, 2015.  On

or around July 1, 2015, Smart Pharmacy changed the formula to one containing Lidocaine, Prilocaine, Duloxetine, Cyclobenzaprine, and Diclofenac.  Smart Pharmacy dispensed this compounded drug to patient 5 one time on or around July 1, 2015.

284.    On or around September 15, 2015, Smart Pharmacy created a change request for patient 5 to receive a compounded topical pain cream containing aripiprazole.  The change request was purportedly authorized by verbal order of one of Dr. E's assistants.  Dr. E is not aware of anything in the professional literature stating that aripiprazole was useful as topical in pain management.  Dr. E would not have knowingly approved a prescription for patient 5 containing aripiprazole.   By making this change, Smart Pharmacy increased its profits on a September 17, 2015 fill of this prescription by approximately $550 above the formula dispensed on July 1, 2015 to patient 5.

285.    Between September 17, 2015, and December 18, 2015, SP2, LLC, submitted three false claims for reimbursement to the TRICARE program for dispensing aripiprazole pain formulas to patient 5, and was paid on the claims.  Selected information from the TRICARE claims for patient 5 is attached in Exhibit 3.

286.    These claims were false because they did not meet the reimbursement criteria in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15).

**F.    Aripiprazole Example 6**

287.    Patient 6 is a Medicare Part D beneficiary insured through UnitedHealthcare.  Patient 6's plan is through Pacificare.

288.   On or around August 28, 2015, Dr. F signed a prescription for topical pain cream containing Lidocaine, Prilocaine, Celecoxib, Duloxetine, Cyclobenzaprine, and Amantadine.  Smart Pharmacy dispensed this compounded drug to patient 6 twice on or around September 4, 2015, and September 28, 2015.

289.   On or around November 19, 2015, Smart Pharmacy created a change request for Patient 6 listing ten different pain formulas, including two containing aripiprazole.  This change request was created on the same day a Smart Pharmacy employee wrote to Balotin: "I found out last night that MGAT and MACT are reimbursing much better for WHP and MED D PacifiCare so we will be changing those."   MGAT and MACT are topical pain cream formulas containing aripiprazole and were both listed on the November 19, 2015 change request for patient 6.  MGAT is the formula that was ultimately dispensed to patient 6 and billed to UnitedHealthcare.  By changing the formula, Smart Pharmacy increased its profits on a November 27, 2015 fill of this prescription by approximately $300 above the formula dispensed on September 28, 2015 to patient 6.

290.   Smart Pharmacy records indicate that Dr. F signed the change request.  Dr. F does not know if topical aripiprazole has any application in pain management.  Dr. F was not aware that aripiprazole was in the prescription and would not have signed the prescription had she realized that the drug was included in the formula.

291.   Between November 27, 2015, and March 9, 2016, SP2, LLC, submitted five false claims for reimbursement to UnitedHealthcare for dispensing aripiprazole pain formulas to patient 6, and was paid on the claims.  As a result, Smart Pharmacy

knowingly caused UnitedHealthcare to submit false PDE claims to CMS based on

information in SP2, LLC's original claims.  Selected information from the PDE claims

for patient 6 is attached in Exhibit 2.

## X.  **REPRESENTATIVE COPAYMENT WAVIER CLAIMS**

292.    Defendants Smart Pharmacy and Balotin submitted or caused to be

submitted approximately 10,615 paid claims to Medicare Part D and approximately

3,360 paid claims to the TRICARE program for which Defendants failed to collect a

complete copayment.  Each of these claims were false or fraudulent under the False

Claims Act for the reasons discussed in Section VIII, supra.

293.    As an example, patient 7 is a Medicare beneficiary insured through

Humana.

294.    On October 23, 2014, Smart Pharmacy Inc. submitted a claim for

reimbursement for a compounded drug containing Tramadol to Humana on a

prescription written by Doctor G for patient 7.  The claim was processed and paid by the

Medicare program on November 18, 2014.  Smart Pharmacy failed to collect the

required copayment of $2.55 for this claim from patient 7.

295.    On December 12, 2014, Smart Pharmacy Inc. submitted a claim for

reimbursement for a compounded drug containing Lidocaine/Prilocaine to Humana on

a prescription written by Doctor G for patient 7.  The claim was processed and paid by

the Medicare program on December 23, 2014.  Smart Pharmacy failed to collect the

required copayment of $2.55 for this claim from patient 7.

296.     On February 23, 2015, Smart Pharmacy Inc. submitted a claim for reimbursement for a compounded drug containing Lidocaine/Prilocaine to Humana on a prescription written by Doctor G for patient 7.  The claim was processed and paid by the Medicare program on March 6, 2015.  Smart Pharmacy failed to collect the required copayment of $2.65 for this claim from patient 7.

297.     On March 23, 2015, Smart Pharmacy Inc. submitted a claim for reimbursement for a compounded drug containing Diclofenac Sodium to Humana on a prescription written by Doctor G for patient 7.  The claim was processed and paid by the Medicare program on April 9, 2015.  Smart Pharmacy failed to collect the required copayment of $2.65 for this claim from patient 7.

298.     On April 20, 2015, Smart Pharmacy Inc. submitted a claim for reimbursement for a compounded drug containing Diclofenac Sodium to Humana on a prescription written by Doctor G for patient 7.  The claim was processed and paid by the Medicare program on May 6, 2015.  Smart Pharmacy failed to collect the required copayment of $2.65 for this claim from patient 7.

299.     On June 16, 2015, Smart Pharmacy Inc. submitted a claim for reimbursement for a compounded drug containing Lidocaine/Prilocaine to Humana on a prescription written by Doctor G for patient 7.  The claim was processed and paid by the Medicare program on July 8, 2015.  Smart Pharmacy failed to collect the required copayment of $2.65 for this claim from patient 7.

300.     On July 15, 2015, Smart Pharmacy Inc. submitted a claim for reimbursement for a compounded drug containing Lidocaine/Prilocaine to Humana on

a prescription written by Doctor G for patient 7.  The claim was processed and paid by the Medicare program on July 24, 2015.  Smart Pharmacy failed to collect the required copayment of $2.65 for this claim from patient 7.

301.    The claims data for patient 7 and additional representative examples of false claims that Defendants submitted or caused to be submitted for patients 8–15 to Medicare Part D and TRICARE are attached as Exhibits 4 and 5.   In all of the claims listed in Exhibits 4 and 5, Smart Pharmacy failed to collect the required copayment from the patient.   For Medicare patients, the amount of copayment waived is indicated in the column entitled Amt Pd Bene POS.  For TRICARE patients, the amount of copayment waived is indicated in the column entitled COPAY_AMT.

**FIRST CAUSE OF ACTION**
**(False or Fraudulent Claims)**
**(False Claims Act, 31 U.S.C. § 3729(a)(1)(A))**

302.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1-301.

303.    By virtue of the acts described above, Defendants Smart Pharmacy and Balotin knowingly presented or caused to be presented false or fraudulent Medicare and TRICARE claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowingly made or presented, or caused to be made or presented, claims for payment for compounded pain creams containing the drug aripiprazole that were not for a medically accepted indication and not reimbursable.

304.    By virtue of the acts described above, Defendants Smart Pharmacy and Balotin knowingly presented or caused to be presented false or fraudulent Medicare and TRICARE claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, Defendants knowingly made or presented, or caused to be made or presented, claims for payment for compounded pain creams for which no copayment was collected, in violation of the AKS.

305.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

306.    By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled under the False Claims Act to treble damages plus a civil penalty for each false or fraudulent claim.

## SECOND CAUSE OF ACTION
### (False Records or Statements Material to False Claims)
### (False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

307.    The United States re-alleges and incorporates by reference the allegations of paragraphs 1-301.

308.    By virtue of the acts described above, Defendants Smart Pharmacy and Balotin knowingly made, used, or caused to be made or used, false records or statements, namely, false drug claims, false statements in PDEs, false provider agreements, false prescriptions, false statements to prescribers, and false statements about compliance with the AKS material to false or fraudulent claims that were paid and approved by the Medicare and TRICARE programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

309.     Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

### THIRD CAUSE OF ACTION
### (Payment by Mistake)

310.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1-301.

311.     This is a claim under federal common law by the United States for the recovery of monies that the Medicare and TRICARE programs paid to Smart Pharmacy by mistake for compounded topical pain creams containing the drug aripiprazole and compounded pain creams that were tainted by kickbacks to patients in the form of copayment waivers.

312.     As a consequence of the conduct and the acts set forth above, Smart Pharmacy was paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

313.     The United States re-alleges and incorporates by reference the allegations of paragraphs 1-301.

314.     This is a claim under federal common law by the United States for recovery of monies by which Smart Pharmacy and Balotin have been unjustly enriched. Medicare and the TRICARE programs conferred benefits on Smart Pharmacy in the form of payments for compounded drug claims that were not reimbursable either

because the aripiprazole component was not for a medically accepted indication or the required copayment was not collected. Smart Pharmacy and Balotin appreciated such benefits, and under the circumstances alleged herein, acceptance and retention of such ill-gotten gains and benefits by Smart Pharmacy and Balotin would be inequitable.

315.    By virtue of the conduct and the acts described above, Smart Pharmacy and Balotin were unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

### PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, the United States respectfully prays for judgment in its favor as follows:

I.      As to the First and Second Causes of Action (False Claims Act) against Defendants Smart Pharmacy and Balotin, for: (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

II.     As to the Third Cause of Action (Payment Under Mistake of Fact), for: (i) an amount equal to the money paid by the United States through the Medicare and TRICARE Programs to Smart Pharmacy, and illegally retained by Smart Pharmacy, plus interest; (ii) the costs of this action, plus

interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

III.      As to the Fourth Cause of Action (Unjust Enrichment), for:  (i) an amount equal to the money paid by the United States through the Medicare and TRICARE Programs to Smart Pharmacy, or the amount by which Smart Pharmacy and Balotin were unjustly enriched, plus interest; (ii) the costs of this action, plus interest, as provided by law; and (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

IV.      All other and further relief as the Court may deem just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Dated this 13th day of June, 2019.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARIA CHAPA LOPEZ
United States Attorney

*/s/ Collette B. Cunningham*
COLLETTE B. CUNNINGHAM
Assistant United States Attorney
Florida Bar No. 0012737
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 700
Jacksonville, FL 32202-4270
Telephone: (904) 301-6326
Facsimile: (904) 301-6310
Collette.Cunningham@usdoj.gov

84

MICHAEL D. GRANSTON
JAMIE ANN YAVELBERG
NICHOLAS C. PERROS
HOLLY H. SNOW
Attorneys
U.S. Department of Justice, Civil Division
P.O. Box 261
Washington, D.C. 20044
Telephone: (202) 616-2629
Nicholas.C.Perros@usdoj.gov
Telephone: (202) 616-2879
Holly.H.Snow@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 13, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all registered CM/ECF participants.

*/s/ Collette B. Cunningham*
COLLETTE B. CUNNINGHAM
Assistant United States Attorney